STATE *versus* EPHRAIM GILMAN.

On the trial of an indictment for murder, the prisoner's testimony before the coroner's inquest upon the body of the person alleged to have been murdered, given without objection by him, before his arrest, though after he had been charged with the murder, and after being cautioned that he was not obliged to testify to anything which might criminate himself, and not purporting to be a confession, is admissible as evidence against him.

ON EXCEPTIONS to the ruling of GOODENOW, J.

INDICTMENT FOR MURDER.

The question raised by the exceptions is stated in the opinion of the Court.

*Howard & Strout,* for the prisoner.

The deceased, Harriet B. Swan, was found in bed and lifeless, on the morning of June 18, 1861. The prisoner had resided in the family of the deceased more than two years. He was *accused by the daughter, that morning, of being the murderer of her mother.* On the same day, a coroner's inquest was held on the body of the deceased, before which the prisoner was called by the coroner, and sworn, and testified. His testimony was taken down in writing by one of the jury, and signed by the prisoner. The exceptions state that "he was cautioned before giving his testimony, that he was not obliged to testify to anything which might criminate himself," "and that he made no objections to giving this testimony."

It does not appear by whom the prisoner was thus "cautioned," but it does appear that he was *without counsel.*

The coroner had authority to summon the witness, or to issue subpoenas for witnesses to be served as in other cases, and it was his duty to administer the prescribed oath to each witness. But it was not his *duty* to *caution* or to *instruct* the witnesses, before they gave their testimony. R. S., c. 139, §§ 5, 6, 9.

The exceptions present the question whether the prison-

State *v.* Gilman.

er's testimony, thus taken, was admissible, against objections, on his trial for the alleged murder.

We hold that his testimony should not have been received, but should have been excluded.

I. Upon principle.

By the common law, *nemo tenebatur prodere se ipsum, vel accusare,* "and his fault was not to be wrung out of himself, but rather to be discovered by other means and other men." 4 Black. Com., 295.

"Nor shall he be compelled to furnish or give evidence against himself." Const. of the United States, Amendment, Article 5.

"He shall not be compelled to furnish or give evidence against himself." Const. Maine, Art. 1, § 6.

The prisoner was legally sworn, and required to testify. The proceedings were in a measure compulsory against him. He could not object to testifying, without quickening suspicions then existing against him, as shown by the accusations of the daughter.

He was without counsel, or adviser, so far as the exceptions show. He was then writhing under the charge of murder directly cast upon him, and *in danger of prosecution for murder.* He was indeed *suspected, and he knew it.* Under the crushing weight of the suspicion and charge, he could not have been unembarrassed or self-possessed; and could not have testified freely and calmly. His confessions and statements, under such circumstances, were neither *free* nor voluntary. And it does not alter the case, that, being without counsel or adviser, he did not object to testifying, or to being sworn; or that he was "cautioned before giving his testimony, that he was not obliged to testify to anything which might criminate himself," by somebody, but by whom it does not appear. By somebody, perhaps, whose caution was meaningless and unnoticed.

He was not told that the testimony he should then give might be used as evidence against him; or that he was not

bound by each and all of the requirements of the oath administered to him. R. S., c. 139, § 5.

Although the prisoner did not make a *confession*, in his testimony before the Coroner's Inquest; yet he detailed, with great particularity, a series of facts and circumstances which led to his immediate arrest, confinement and subsequent prosecution; and on which the government rely for his conviction. These statements or admissions were *extorted* from him by an official examination, and in the course of judicial proceedings. So the prisoner was compelled, though probably unconsciously, to weave the web for his own. pall.

Disguise it as they will, the prisoner was made to condemn himself, if the facts stated by him can justly lead to his condemnation. For without his admissions thus obtained, — thus cruelly drawn from him, the government could not have claimed a conviction, as we have a right to infer, from the fact that they were pressed into evidence at the trial.

A judicial oath administered to one whose mind is agitated and disturbed by an inquest upon the body of one whom he is suspected and accused of murdering, would naturally prevent free and voluntary mental action; and this is the reason why evidence thus given should be excluded, on his trial for the offence.

The head and heart alike revolt at the suggestion of obtaining testimony by *torture*, for any purpose, and especially for the conviction of a capital offence, and where the tortured is made to condemn himself.

There was *moral torture* brought to bear upon the prisoner before the inquest, and the testimony obtained from him is supposed to be fatal. It is invoked for his condemnation.

Such testimony must be regarded by the Court as, not only not *free and voluntary*, but *unreliable*. It is too strategic and inquisitorial — and ought not to have been received. Neither truth nor justice requires such means to establish a criminal charge.

The oath prescribed by statute, (R. S., c. 139, § 5,) is as follows : — "You solemnly swear that the evidence which you shall give to this inquest, concerning the death of the person here lying dead, shall be the truth, the whole truth, and nothing but the truth, so help you God." This oath was administered by the coroner to the prisoner, as a witness before the inquest ; and it was an *inducement* and more, presented to him, to confess and disclose all, concerning the subject matter of the death, as under Divine sanction. Was it not a solemn declaration and injunction to him, to tell all he knew of the matter, if he desired the help of God? What higher inducement could have been held out to him, in order to obtain a full confession?

If the coroner had said as much to him, without the sanction of an oath, — as if he had said you had better confess, — you ought to tell all you know about it — or you must do it, if you want the favor of God — it is very clear that a confession or admission thereupon made would not have been received as evidence against the prisoner. Was the inducement less effective, when made under the form and solemnity of an oath?

The course proper to be taken by the coroner, in cases like this at bar, is very clearly stated by GURNEY, B., in *Rex* v. *Greene*, 5 C. & P., 312, (24 Eng. C. L., 581,) as follows : — " A prisoner ought to be told that his confessing will not operate in his favor : and that he must not expect any favor because he makes a confession ; and that if any one has told him that it will be better for him to confess, or worse for him if he does not, he must pay no attention to it ; and that anything he says to criminate himself will be used as evidence against him on his trial. After that admonition, it ought to be left entirely to himself whether he will make any statement or not." The rule and the directions apply with equal force where the person is compelled to testify, for the purpose of establishing his own connection with the crime — of which he was then suspected and accused of being guilty. If the coroner had pursued the course, and

had given the instructions suggested by Baron GURNEY, and which have been sanctioned by a long usage in England, at least, the statements of the prisoner, if made after such caution, might, perhaps, have been properly received against him on his trial.

In this respect the English statute, 11 & 12 Victoria, c. 42, § 18, deserves the highest commendation and respect for the humanity of its provisions, for parties charged with felonies or misdemeanors. So of the statute of New York, Part 4, c. 2, Title 2, §§ 14, 15. 1 Archbold's Cr. Practice, by Waterman, *132. "Such, (says the author) is the humane provision of the English law, to prevent a prisoner from committing himself, by any unadvised admission, which otherwise, in his confession and agitation arising from the proceedings against him, he might make without calculating on its consequences.

"It is in the true spirit of fairness towards the prisoner, which distinguishes the administration of criminal justice in this country, from its administration in any other country in Europe."

II. Upon authority.

There has been an apparent conflict of authorities on the question presented in this case, resulting in part from imperfect statements of the cases, and the principles settled, and from the different nature of the jurisdictions of courts, as well as from different statute regulations. Those cases involving simply the construction of the statutes 1 and 2 Phil. & M., c. 13; 2 and 3 Phil. & M., c. 10; 7 Geo. 4, c. 64; and 11 and 12 Vic., c. 42; and being cases of confessions and declarations of prisoners, under arrest, can have little application to this case, except by way of analogy and illustration.

But the cases most cited in elementary treatises and discussions, and which have a direct bearing on this, are referred to in 2 Russell on Crimes, 857—860, and notes; 1 Archbold's Crim. Law, 412; Roscoe's Crim. Ev., 45; 2 Stark. Ev., 28; 1 Greenl. Ev., §§ 224—226, and are much

discussed in some of the cases to which we shall refer hereafter.'

The cases in which the previous statements of a person, *made under oath*, can be offered against him, on trial for crime, may be arranged in three classes.

1. Where the oath was administered to him in some proceeding, in which the crime itself was not under investigation directly.

2. Where it was administered by a magistrate in some preliminary examination as to the crime.

3. Where it was taken before a coroner's inquest.

*Rex* v. *Merceron*, 2 Stark. R., 366, *Regina* v. *Wheater*, 2 Moody's Crim. Cases, 45, belong to the *first* class.

*Rex* v. *Lewis*, 6 Car. & P., 161, (25 Eng. C. L., 373,) *Rex* v. *Davis*, 6 Car. & P., 177, (25 Eng. C. L., 381,) *Rex* v. *Haworth*, 4 Car. & P., 254, (19 Eng. C. L., 502,) belong to the *second* class. In the first two, the proof offered at the trial was rejected; but, in the third, it was received, upon the ground that the statement was made by him " before the prisoner was either *charged* or *suspected* of any crime." And so it was held in *Rex* v. *Tubby*, 5 Car. & P., 530, (24 Eng. C. L., 691.)

The cases of *Regina* v. *Owen & als.*, 9 Car. & P., 83, (38 Eng. C. L., 60,) *Regina* v. *Owen & als.*, 9 Car. & P., 238, (38 Eng. C. L., 149,) *Regina* v. *Wheeley*, 8 Car. & P., 250, (34 Eng. C. L., 375,) *Regina* v. *Sandys*, 1 Car. & Marsh., 345, (41 Eng. C. L., 191,) and the case referred to in the note to *Haworth's* case, belong to the *third* class. And, in *Owen & als'. first* case, and in *Sandys'* case, the evidence was received *de bene* only, and the question was reserved for the fifteen Judges, and never afterwards considered, as in both cases the prisoners were acquitted; while, in the *second* case of *Owen & als.*, and in *Wheeley's* case, and the case cited in the note to *Haworth's* case, the evidence was rejected.

This classification, as stated by SELDEN, J., in *Hendrickson's* case, discloses the striking fact, that there has, so far

as appears, never yet been a single *reported decision* in England, in favor of the admissibility, under any circumstances, upon a trial for murder, of the examination of the prisoner before a coroner's jury.

The two cases in which it was received, reserving the question, have not the weight of decisions, even at the assizes; because that is the only mode in which the opinion of the Court *in banco*, in England, can be obtained. So far as authority goes, therefore, there are *three decisions* at the English assizes against, and *not one* in favor of its admissibility.

In *State* v. *Broughton*, 7 Iredell, (North Carolina,) 96, the prisoner had been examined before the grand jury, on oath, respecting the murder for which he was subsequently indicted. His statements before the grand jury were admitted against him, on his trial, on the ground that they were voluntary. But it does not appear that, at the time of the examination, the prisoner was implicated or suspected of the crime; and his statements were not likely to have been affected by his position at the time of testifying, or by attending circumstances. But this case, though somewhat peculiar, expressly recognizes the correctness of the decision in *Lewis'* case.

In *The People* v. *Hendrickson*, 6 Selden, (N. Y.,) 13; same case, 1 Parker's Cr. Cases, 396, 423, the authorities were fully examined and much discussed. The case was tried at Oyer & Terminer, at Albany, July, 1853, when the statements of the prisoner, upon oath, before the coroner's inquest, were offered, and received, on his trial for the murder.

Exceptions were taken on that and other grounds by the prisoner, after verdict against him. WRIGHT, Justice, at Chambers, sustained the exceptions, so far as to allow a writ of error, mainly on the ground of the exception to the admission of such statements, as evidence against the prisoner.

In the Supreme Court, opinion by HARRIS, Justice, the judgment of the Court at Oyer & Terminer was affirmed.

The case then went to the Court of Appeals, where the judgment was affirmed by a majority of that Court, *voting* 6 to 2. The opinions by WRIGHT, and HARRIS, and PARKER, in the Court of Appeals, review the cases somewhat at length. And the opinion of SELDEN, Justice, dissenting, in the Court of Appeals, is very searching, critical and thorough, and under our law and practice, conclusive against the admissibility of this evidence.

In *The People* v. *McMahon*, 1 Smith's R., 384, Court of Appeals, N. Y., 1857, it was held that such evidence was not admissible on the prisoner's trial for murder. And it was then distinctly held that "a judicial oath administered when the mind is agitated and disturbed by a criminal charge, may prevent free and voluntary mental action, and this is the reason for excluding evidence thus given." The statements, thus offered and rejected, had been made by the respondent upon oath, before a coroner's inquest, in reference to the death of the person, for whose murder he was afterwards indicted. He had been arrested by a constable, though without warrant, and taken before the coroner on suspicion of being the murderer of his wife, upon whose body the coroner was then holding an inquest.

In *Commonwealth* v. *King*, 8 Gray, (Massachusetts,) 501, the testimony of a person given under oath, before a coroner's inquest, to investigate the origin of a fire, and where the punishment by statute could be only imprisonment not exceeding ten years, was admitted, on his subsequent arrest and trial for the supposed offence. But the testimony was given before any prosecution was instituted against any one; and it would seem before any suspicion attached to the prisoner, and before he was in any manner implicated. He could not have been conscious, when testifying, that any suspicion rested upon him, and his mind was not agitated or disturbed by any such consideration.

His statements were free and voluntary, and without embarrassment apparently.

It is submitted that that case cannot properly be invoked, as sustaining the position taken by the government in this case. In that, the offence was but a misdemeanor; in this, it is capital, and that would constitute a marked distinction between the two cases, even if there were no other difference.

No other reported case has been found in the Reports of that State.

In this State, the testimony has been excluded invariably, until offered in this case.

In *State* v. *Knight*, 43 Maine, 11, on the trial of the prisoner for murder, his testimony at the coroner's inquest, before any arrest was made, was offered and excluded, and the prisoner was convicted.

In *State* v. *Coffin,* tried in Oxford county, August term, 1861, such testimony was in like manner offered and excluded.

There is a manifest distinction between the examination of a person upon a direct inquiry as to a crime with which he is subsequently charged, and his testimony in another case. This distinction is clearly stated and maintained by Mr. Greenleaf. After having stated the decision in *Rex* v. *Lewis,* he says : — "This case may seem, at the first view, to be at variance with what has just been stated, as the general principle in regard to testimony given in another case, but the difference lies in the different natures of the two proceedings. In the former case, the mind of the witness is not disturbed by a criminal charge, and, moreover, he is generally aided and protected by the presence of counsel in the cause, but in the latter case, being a prisoner subjected to an inquisitorial examination, and himself at least in *danger of an accusation,* his mind is brought under the influence of those disturbing forces, against which it is the policy of the law to protect him." 1 Greenl. Ev. § 226. *The*

*People* v. *Hendrickson*, 6 Selden, (N. Y.,) 13, the dissenting opinion by SELDEN, Justice.

And the distinction is just as clear and cogent, where the witness, though not a prisoner at the time, is subjected to an inquisitorial examination, *conscious that he is suspected, and in danger of a prosecution;* for his mind would be subjected to the same disturbing forces, against which it is the dictate of humanity, as well as the policy of the law, to protect him.

If it be wrong to wring from a person, under prosecution, testimony to support it, it is equally wrong to do so, to procure his prosecution.

*Drummond, Attorney General,* for the State.

The opinion of the Court was drawn up by

RICE, J.—To elicit truth is the object of human testimony. All rules for the production of testimony are constructed with a view to accomplish this object. Testimony, therefore, which, in the opinion of the lawgiver, tends to this end, is received, while that which is of an opposite or even doubtful tendency, is rejected as untrustworthy and incompetent.

In criminal cases, the common law is more guarded in its rules for the introduction of testimony, than in civil proceedings, and, from its regard for life and liberty, excludes many facts and circumstances as being of doubtful tendency which it receives unchallenged in civil suits. Of this character are certain classes of confessions of parties charged with crime.

In civil proceedings all the admissions or confessions of a party may be given in evidence against him. In criminal cases such confessions, to be admissible, must not only be voluntarily made but without undue influence also.

That no one is bound to accuse or betray himself, are maxims of the common law. Nor shall he be bound, in a criminal case, to furnish or give evidence against himself.

Const. of U. S., Art. 5, Amendments; Const. of Maine, Art. 1, § 6.

In the case at bar, the government was permitted to introduce, on trial, against the prisoner, the testimony which he had given before the coroner's jury, when the cause of the death of the person for whose murder he was then on trial was under investigation. At the time of the investigation before the coroner, the prisoner had not been arrested, though it appears in the case that he had been charged with the murder. He was cautioned, before giving his testimony at the coroner's inquest, that he was not obliged to testify to anything that might criminate himself; and he made no objection to giving his testimony. His testimony contained no confession that he had any knowledge of, or in way participated in, the death of the deceased. On the other hand, he denied all such knowledge or participation.

The question presented is, was this testimony in the eye of the law voluntary, and given without improper influence?

The objection is, that it was under oath, and therefore, in legal contemplation, compulsory.

Prior to the statutes of 1 and 2 Phil. and Mary, c. 13, 2 and 3 Phil. and Mary, c. 10, and 7 Geo. 4, 64, the examination of a prisoner before the magistrate, touching his guilt or innocence, was not warranted by law, for, at the common law, his fault was not to be wrung out of himself, but rather to be proved by others. 1 Phil. Ev., 114, n.

Under these statutes, the practice of examining the prisoner when charged with crime seems to have originated in courts of common law. This practice has been very carefully regulated and guarded by the more recent statute of 11 & 12 Victoria, c. 42, in which the mode of proceedings on the part of the magistrate is very minutely pointed out.

Under the earlier statutes, the information against the prisoner before the magistrates are to be taken on oath; the account given by the prisoner ought to be taken without oath. If the prisoner has been sworn, his statements cannot be received; and, if the written deposition of the prisoner

State *v.* Gilman.

purports to have been taken on oath, evidence is not admissible for the purpose of showing that, in point of fact, he was not sworn. 1 Phil. Ev., 113 ; 2 Russ. on Crimes, 855 ; *Rex* v. *Smith*, 1 Stark. R., 242 ; *Rex* v. *Rivers*, 7 Car. & P., 177 ; *Rex* v. *Walter*, 7 Car. & P., 267 ; *Rex* v. *Davis*, 6 Car. & P., 177.

The prisoner is not to be examined on oath, for this would be a species of duress and a violation of the maxim that no one is bound to criminate himself. 4 Stark. Ev., 52.

It is worthy of remark, that this practice of examining the prisoner before the magistrate seems to have originated in a desire to compel the magistrate to discharge his duty, rather than to extract evidence from the prisoner prejudicial to himself.

Hence the preamble to c. 13, 1 & 2 Phil. and Mary, among other things, recites " that one justice of the peace in the name of himself and one other of the justices, his companion, not making the said justice party nor privy unto the case wherefore the prisoner should be bailed, hath often times, by sinister labor and means, set at large the greatest and notablest offenders, such as be not repleviable by the laws of the realm ; and yet rather to hide their affection in that behalf, have signed the cause of their apprehension to be but only *suspicion* of felony, whereby the said offenders have escaped unpunished, and do daily, to the high displeasure of Almighty God, the great peril of the king and queen's subjects, and the encouragement of all thieves and evil doers. For the reformation whereof § 4 provides : —

" That the said justices, or one of them, being of the quorum, when any such prisoner is brought before them for any manslaughter or felony, before any bailment or mainprize, shall take the examination of said prisoner, and information of them that bring him, of the facts and circumstances thereof, and the same, or so much thereof as shall be material to prove the felony, shall put in writing before they make the same bailment; which said examination, together with said bailment, the said justices shall certify to

the next general goal delivery to be holden within the limits of their commission."

Chapter 10, 2d & 3d Phil. and Mary, contains similar provisions relative to the examination of prisoners *suspected* of manslaughter or felony. Neither of these Acts provide that the prisoner, or " those who bring him," shall be examined on *oath.* But c. 64, 7 Geo. 4, § 2, provides that the magistrate shall take the examination of the prisoner, and the information *upon oath* of those who shall know the facts and circumstances of the case, and shall put the same, or so much thereof as shall be material, in writing. These examinations, thus reduced to writing, were made competent evidence against the prisoner upon trial. Being armed with this inquisitorial power, and, by law, compelled to use it, the certified examinations made by the magistrate become most potent evidence against the prisoner, and, to protect him, as far as practicable, in his common law rights of not being obliged to criminate himself, courts stood by the letter of the statute and refused to receive any statement of the accused, which had been made by him before the examining magistrate under oath, on the ground that such sworn statements were not voluntary confessions, but coerced self criminations.

The courts, in some cases, went still further and not only excluded the sworn statements of the accused, when made before the examining magistrate, but also statements of the accused when made before other tribunals as witnesses, under oath. Thus, in *Rex* v. *Lewis*, 6 Car. & P., 161, the prisoner was examined as a witness before a magistrate, before any specific charge was made against any one, but, on the conclusion of the examination, the prisoner was committed for trial. The examination was offered on trial, but was rejected by Gurney, B., on the ground that the examination was not perfectly voluntary.

In *Regina* v. *Wheely*, 8 Car. & P., 250, a party, who was charged with murder, made a statement before a coroner at the inquest, which was taken down. The statement was

apparently on oath. ALDERSON, B., excluded the testimony on trial, and also excluded parol testimony to show that the statement really was not made on oath.

In *Regina* v. *Owen & als.*, 9 Car. & P., 238, the depositions of the prisoners, taken before the coroner on oath, were rejected on their trial for murder, though they had been received when the same parties were on trial for rape upon the person with whose murder they were subsequently charged.

In a note to *Howarth's* case, 4 Car. & P., 254, it is stated that in a case at Worcester, where it appeared that a coroner's inquest had been held on the body, and it not being suspected that B was at all concerned in the murder of A, the coroner had examined B on oath as a witness. PARKE, J. would not allow the deposition of B, so taken on oath, at the coroner's inquest, to be read in evidence on the trial of an indictment afterwards against B for the same murder.

These cases were all *Nisi Prius* decisions, and evidently follow the cases before cited, which were based upon the statutes to which reference has already been made. The analogy between the two classes of cases is very close, especially when the examination was with reference to the subject matter for which the prisoner was subsequently tried, and where at the time he was conscious of the jeopardy in which he stood. But they do not fall under the same statute or technical rule.

There is another class of cases in which the same kind of testimony, with little apparent distinction of circumstances, has been admitted. Thus, in *Rex* v. *Merceron*, 2 Stark. R., 366, which was an indictment against the defendant for misconduct as a magistrate, it was proposed to prove on the part of the prosecution what had been said by the defendant in the course of his examination before a committee of the House of Commons, appointed for the purpose of inquiring into the police of the metropolis, where he had been compelled to appear. It was objected by the defendant that the examination, having been made under compulsory pro-

cess from the House of Commons, it was not voluntary, and therefore not admissible, but ABBOTT, J., admitted it.

In *Rex* v. *Howarth*, 4 Car. & P., 254, which was an indictment for forgery, the counsel for the prosecution called the clerk of the magistrate by whom the defendant had been examined, who stated that, before the prisoner was either charged or suspected of having committed any offence, he was called as a witness against one Shearer who was tried for forgery, and swore to a deposition, which, being offered in evidence, was admitted by PARKE, J.

In *Rex* v. *Tubby*, 5 Car. & P., 530, it was proposed to read a deposition made by the prisoner when not under any suspicion, which was objected to, but VAUGHAN, B., remarked, " I do not see any objection to its being read, as no suspicion attached to the party at the time. - The question is, is it the statement of the *prisoner* upon oath? Clearly it is not, for he was not a prisoner when he made it."

The learned Baron evidently had in his mind the statutes which have been cited, and, perceiving that the case did not fall within their provisions, that is, perceiving that the defendant was not under examination for the offence when the deposition was given, admitted it though under oath.

In the case of *Regina* v. *Wheater*, 2 Moo. Cr. Ca., 45, which was an indictment for forgery, on trial the examination of the prisoner on oath as a witness, before the commissioners of bankruptcy, concerning the bills alleged to have been forged, was held admissible as evidence against him. The case was subsequently examined before all the Judges except PARKE, J., and GURNEY, B., who held that the evidence was properly admitted.

In *Regina* v. *Owen & als.*, 9 Car. & P., 83, on an indictment for rape, the statements made by Owen on oath, at the inquest, held on the body of the person ravished, was admitted in evidence by WILLIAMS, J., against objection. The prisoners in this case were acquitted, but were subsequently tried for the murder of the same person, and the

State *v.* Gilman.

·same statement was offered but rejected. This case has been cited above.    9 Car. & P., 238.

In *Regina* v. *Sandys*, 1 Car. & Marsh., 345, the prisoner was tried for murder, and her deposition, taken at the coroner's inquest, was received in evidence against her, by ERSKINE, J., who reserved the point of its admissibility for the consideration of the fifteen Judges.

The foregoing are among the leading English cases upon this subject.    With the exception of *Wheater's* case, they were *Nisi Prius* decisions.    So far as they fall within the provisions of the statute, the reasons on which they were made is obvious.    So far as they are outside of the statute, it is not easy to discover any principle or rule by which they can be reconciled.    In point of numbers merely, the authority would preponderate in favor of admitting the evidence, and that preponderance is increased when it is remembered that *Wheater's* case has the sanction of the whole Court.

In this country, the reported cases bearing upon this question are not numerous.    In New York and several of the other States, statutes exist relative to the examination of persons charged with crime, of a character similar to the English statutes.    In this State, however, we have no such statute provision.

In the case of *People* v. *Thayer & als.*, 1 Park. Cr. Ca., 596, Isaac Thayer, one of the prisoners, voluntarily appeared before the committing magistrate and gave evidence when the case of one of the other prisoners was on examination.    The Court held that he could not object to the admission as evidence against himself, of the statements he had made under oath on that examination.

In *Hendrickson* v. *The People*, 6 Selden, (N. Y.,) 13, the statement of Hendrickson, made on oath before the coroner, before he was charged with the crime for which he was subsequently indicted and tried, was on his trial admitted in evidence against him.    The case was subsequently carried to the Court of Appeals, where it received a very

full examination, both by counsel and the Court, and the admission was held to be right by a majority of the Court, in an opinion by PARKER, J. SELDEN, J., delivered an able dissenting opinion.

In *People* v. *McMahon*, 1 Smith, (N. Y.,) 384, the defendant had been arrested by a constable without warrant, and brought before a coroner who was then holding an inquest on the body of the deceased, for whose murder the defendant was subsequently indicted, where he was examined as a witness on oath, without objection on his part. His statements then made were offered in evidence against him on trial. The question of the admissibility of the evidence was presented to the Court of Appeals, and held inadmissible in an elaborate and learned opinion by SELDEN, J. See also *Commonwealth* v. *King*, 8 Gray, 501.

In this State, in *Knight's* case, also in *Coffin's* case, the statements of the prisoners before the coroner's inquest were offered, but not admitted. These were trials at *Nisi Prius*, and it does not appear whether the parties had testified voluntarily, or were admonished of the right to withhold their testimony, or were called and sworn like other witnesses.

From a review of the cases to be found in the books, most of which are *Nisi Prius* decisions, and made without much consideration, it will be found difficult to deduce a *rule* based upon any general principle. Most of the cases have turned upon the question whether the prisoner was or was not *sworn* when the statement offered in evidence was made. The origin of this rule, so far as it has excluded such testimony, as has already been stated, is based upon statutory provisions. Being without statute in this State, and having no settled judicial rule established by our courts, we are at liberty, or rather required, to settle the question under the provisions of our constitution, and in accordance with general principles.

A free and voluntary confession of guilt, made by a prisoner, whether in the course of conversation with private individuals, or under examination before a magistrate, is ad-

missible in evidence as the highest and most satisfactory proof, because it is fairly to be presumed that no man would make such a confession against himself, if the facts confessed were not true. 2 Russ. on Cr., 824; Gilb. Ev., 123; *Lamb's* case, 552.

The general rule is, that all a party has said, which is relevant to the question involved, is admissible in evidence against him. The exceptions to this rule are where the confessions have been drawn from the prisoner by means of threats or promises, or where it is not voluntary, because obtained compulsorily or by improper influence. *Hendrickson* v. *People*, 6 Seld., 13.

The true test of admissibility in this class of cases is, was the statement offered in evidence made *voluntarily, without compulsion*? If this proposition be answered in the affirmative, then the statement is clearly admissible in principle; but if not *voluntary*, if obtained by any degree of *coercion*, then it must be rejected, as well by the rules of the common law as by positive constitutional provision.

Does it follow that because a statement is made upon oath, in a proceeding where the circumstances of the commission of the crime are being investigated, and the person making such statements is a suspected or accused person, that it must necessarily be involuntarily made? May not a man depose on oath as freely as he may speak when unsworn? And, if so, do his statements become any less reliable than when made without the sanction of an oath?

But the argument is, that, as a witness, he is sworn to state "the truth, the whole truth, and nothing but the truth." And that the impressiveness of obligation, and the solemnity of the occasion, would have a tendency to wring from the party thus situated facts and circumstances which he is not bound to disclose, and therefore can in no just sense be said to be voluntary. As a general proposition, this may be true, especially if the party is uninformed with regard to his rights. But when he is fully apprised of his rights, and informed that he is under no legal obligation to

disclose any facts prejudicial to himself, or to give evidence against himself, and then deliberately makes statements under oath, no good reason is perceived why such statements should not be given in evidence against him. He may testify as freely as he may speak.

If it be said that, though a party in such a situation may be under no legal constraint, he may nevertheless feel under a degree of moral compulsion, and from that cause feel impelled to make self-criminative statements, the answer is, that this moral pressure bears with no greater force upon him when on the stand voluntarily, than in other situations. A party who finds himself surrounded with circumstances calculated to cast suspicion upon him, will undoubtedly feel the necessity of making explanations. He may be conscious that a failure to explain will tend to strengthen suspicion already resting upon him. But such considerations have never been deemed good cause for excluding declarations which he may choose voluntarily to make. Under such circumstances, and with a view to divert suspicion from himself, he may make incorrect statements, or, impelled by fear, or, in hope of improving his situation, he may confess himself guilty. Still, the law holds all such statements or confessions, when made self-moved, and without foreign influence, to be admissible in evidence against him. It may be unfortunate, and be deemed a defect in the law, that while these statements or confessions thus made may be used against him, he is debarred upon trial from making any personal explanation thereof, yet such is the rule which the wisdom of ages has established, and by which we must abide until changed by legislative enactment.

The law protects the party against legal constraint as a witness, and against the influence of those who by their position may be in a situation to influence his conduct, by exciting his hopes or awakening his fears, and thus inducing him to make statements which may not be true, for the purpose of improving his condition. But it no more excludes

State *v.* Gilman.

these voluntary declarations, statements or confessions, which are the result of his own moral convictions, the manifestation of his own free will, than it does his voluntary actions. The acts and declarations of persons guilty of crime generally furnish the key by which their guilt is brought to light. God in his providence has so ordered, that truth will disclose itself by words and actions, despite the most artful practices of the most skilful and practiced dissembler. To ascertain truth we have but carefully to observe the operation of these immutable laws. Falsehood is always inconsistent with truth and can seldom be made apparently to coincide with it. Hence the very artifices to which crime frequently resorts to conceal itself become the most efficient means of detection.

The declarations of accused persons are not necessarily *confessions*, but generally, on the other hand, they are denials of guilt, and consist in attempts to explain circumstances calculated to excite suspicion, and those denials are generally volunteered. Shall they, when thus made under oath or otherwise, be excluded from consideration? To do so would be manifestly to close the eyes of the ministers of justice to one of the most effectual means of detecting guilt.

Great care should undoubtedly be taken to protect the rights of the accused. His secret should not be extorted from him by the exercise of any inquisitorial power. He should be fully informed of his legal rights, when called upon or admitted to testify as a witness in a matter in which his guilt is involved. No officious party should be permitted to extract confessions from him, by operating upon his hopes or his fears. But his *voluntary* statements, declarations or confessions, like his *voluntary* actions, wherever or whenever made, are legitimate and proper matters for judicial consideration, so far as they bear upon and tend to illustrate the question of guilt or innocence.

In the case at bar, the prisoner, when on the stand before the coroner's inquest, was properly advised of his rights. He acted under no compulsion. He made no confessions.

On the other hand, his statements were evidently designed to repel suspicion. There was no attempt to ensnare him. His statements must therefore be deemed to have been voluntary, though made under oath. If they were inconsistent with surrounding circumstances, it is only another illustration of the proposition that falsehood is inconsistent with truth, and tends to its own exposure.

*Exceptions overruled.*

*Judgment on the verdict.*

APPLETON, CUTTING, DAVIS, KENT and WALTON, JJ., concurred.