Ricardo Ascarate was convicted of manslaughter, and appeals. Affirmed.

WADE & WADE and LLEWELLYN & LLEWELLYN of Las Cruces, for appellant.

It was error for the court to instruct the jury on manslaughter.

People v. Kelly, 140 Pac. (Cal.) 302; 21 Cyc. 1076; Territory v. Hendricks, 13 N. M. 300; Mullins v. Com., 67 S. W. (Ky.) 824; sec. 1460, Code 1915; Logan v. State, 53 S. W. (Tex.) 694.

It was error to permit statements of accused made before the coroner's jury to be read in evidence.

Sec. 15, Bill of Rights, Const.; People v. Mondon, 103 N. Y. 211, 57 Am. R. 709; Adams v. State, 58 S. E. (Ga.) 822, 17 L. R. A. (N. S.) 468; Tuttle v. People, 33 Colo. 243, 70 L. R. A. 33; State v. O'Brien, 43 Pac. (Mont.) 1093; Wood v. State, 22 Tex. App. 431, 3 S. W. 336; Bram v. U. S. 168 U. S. 533; State v. Clifford, 86 Iowa, 550, 41 Am. St. R. 518; Adams v. State. 17 L. R. A. (N. S.) 468; Wilson v. U. S., 162 U. S. 610; 1 R. C. L. 570; Maki v. State, 112 Pac. 334, 33 L. R. A. (N. S.) 465; State v. Sanchez y Armijo, 18 N. M. 267; Counselman v. Hitchcock, 142 U. S. 547; People v. Lander, 82 Mich. 109, 46 N. W. 956; State v. Young, 24 S. W. 1038; Twinning v. New Jersey, 211 U. S. 77; Anderson v. State, 126 Pac. (Okla.) 840, Ann. Cas. 1914, c. 314; State v. Young, 60 N. C. 126; Clough v. State, 7 Neb. 320; Schoeffler v. State, 3 Wis. 823; Farkas v. State, 60 Miss. 847; State v. Young, 119 Mo. 495, 24 S. W. 1038; Com. v. Rockwell, 19 Pa. Co. Court, 631; Twigs v. State, 75 S. W. 531.

A witness cannot be impeached on collateral and immaterial matter.

1 Whart. Crim. Ev. (10th ed.) 1001; 40 Cyc. 2699.

FRANK W. CLANCY, Attorney General, for the State.

Appellant's version of the facts has been determined by the jury.

State v. Lucero, 17 N. M. 484, 486.

Exceptions to instructions were too general.

Territory v. Yarberry, 2 N. M. 454; Territory v. Gonzales, 11 N. M. 326; Territory v. O'Donnell, 4 N. M. 196, 208-9-10; Territory v. Baker, 4 N. M. 236, 274; U. S. v. Duran, 6 N. M. 173, 178; Padilla v. Territory, 8 N. M. 562, 564; Territory v. Watson, 12 N. M. 419, 421-2; Lund v. Ozanne, 13 N. M. 293, 299; Territory v. Caldwell, 14 N. M. 535, 543-4; U. S. v. Cook, 15 N. M. 124, 132; Territory v. Harrington, 17 N. M. 62, 68; Territory v. Lobato, 17 N. M. 666, 682; State v. Eaker, 17 N. M. 479, 481-2; State v. Lucero, 17 N. M. 484-486.

As to admissibility of statement or confession see:

State v. Armijo, 18 N. M. 268. 269.

## STATEMENT OF FACTS.

In February, 1913, Ricardo Ascarate, the appellant, was indicted by the grand jury for the county of Dona Ana, N. M., and charged therein with the murder of Ana Barela de Ascarate, his wife. Upon his application, change of venue was granted to Lincoln county, where he was tried, found guilty of manslaughter, and sentenced by the court to imprisonment in the state penitentiary for a period of not less than nine years, nor more than ten years, and required to pay the costs of the prosecution. From that verdict and sentence of the court, he appeals.

The appellant and Ana Barela de Ascarate, the deceased, were married by a justice of the peace, in Las Cruces, N. M., on December 11, 1911. At that time the deceased was less than 17 years of age. Immediately after their marriage they went to El Paso, where they lived until May, 1912, when they returned to Las Cruces. At the time of the death of Ana Barela de Ascarate, she and appellant were living together in a double apartment house on Amador street in Las Cruces, they occupying the east wing thereof, while a Mr. and Mrs. Bundy occupied the west wing thereof.

Between 8 and 9 o'clock in the evening of the 9th day of November, 1912, appellant and his wife returned home from a short walk about the business district of the town. Appellant did not enter the house, but left his wife at the door. He then returned to the business district, uptown proper, where for something over three hours he frequented saloons and indulged in the use of intoxicating liquor. To exactly what extent he indulged in liquor it does not appear. However, it does appear that shortly after the discovery of the lifeless body of his wife, he was perceptibly under the influence of liquor. Close to midnight Mrs. Bundy heard the report of a revolver in the apartment of the Ascarate family. It was loud and distinct. Between two and five minutes thereafter she heard a second report in their apartment, which was not so loud nor distinct, but was immediately followed by a feminine scream, ending in a moan or gurgling sound as if a person were choking. For several minutes thereafter silence reigned. Then some one was heard walking back and forth through two rooms of the Ascarate apartment. This continued for about fifteen minutes, when the person passed out of the house, through a north door, shut the door, slammed the screen door, and came to the sidewalk. He then went across the street. He was walking very fast. Mrs. Bundy recognized the sound of the footsteps as those of the appellant. About 1 o'clock that night Dr. Minitree and a man named Vanderbilt reached the Ascarate apartments, in company with Guadalupe Ascarate, the father of appellant. Dr. Minitree had been summoned to the home of the father. They entered the house, passed through the front room, which was dark, and entered the lighted back room. There they found the body of Ana Barela de Ascarate, wife of appellant, lying lifeless in a diagonal position across the bed, the feet hanging over the bed. The body was clothed in an undershirt and gown, the latter being torn down the front. On the body were the stockings and one shoe. A superficial examination of the body was made by Dr. Minitree. The examination disclosed that a bullet had entered the

right arm, below the attachment of the deltoid muscles.
slightly external, which fractured the humerus, passed up-
ward,· penetrated the chest between the fourth and fifth
ribs, passed through the right lung, and, hitting a rib,
was deflected, inward, backward, and slightly upward,
the bullet lodging in the base of the heart. The ball en-
tered the chest on the right side in front of the axillary
line. A pistol was found lying on the springs of the bed,
about half the width of the bed from where the body was
lying, too far in the opinion of several witnesses for the
deceased to have reached it. It contained three loaded
shells, and two which had been recently exploded. .The
gown upon the body was blood-stained and torn down the
front. A pint bottle of whisky, full to within an inch
and a half from the top, was found on the chair near the
bed. The examination of the body showed that the de-
ceased was in a pregnant condition, and had been so for
about six or seven months. Felipe Lucero, the sheriff,
was summoned to the Ascarate apartment. He passed
through the house to the bedroom, saw the deceased ly-
ing on the bed, and, seeing Dr. Minitree and Vanderbilt
in attendance, immediately left. He then ordered a dep-
uty to summon the justice of the peace and a coroner's
jury, while he returned to the home of Guadalupe Asca-
rate, the father of appellant. There the father delivered
the appellant to the custody of the sheriff. The sheriff
and appellant then went to the latter's home. En route
the appellant volunteered the information that a great
misfortune had befallen him in the fact that his wife
had committed suicide. Appellant and the sheriff entered
the front room of the Ascarate house, which was dark, and
there they remained for more than an hour, during which
time the coroner's jury was investigating the cause of the
death of the deceased and examining the body. During
this time the appellant's conduct indicated a condition of
slight intoxication. At times he appeared excited and
demanded entrance to the room where lay the lifeless body
of his wife. He attempted such entrances by force, but
was each time overcome or calmed by the sheriff. The

coroner's jury and the justice of the peace then adjourned to the office of the justice of the peace. The sheriff conducted the appellant to the office of the justice of the peace. On behalf of the state evidence was received showing that the appellant was asked there if he wanted to make a statement, and was advised by the justice that anything which he would say might be used against him in the trial of the case. The sheriff, Essen, and Viscarra, so testified. The witness Nevares testified that the justice of the peace advised the appellant that he should be very careful about what he said "because you may have to repeat the same thing after." The witness Sais testified that the justice advised the appellant: "Be careful as to what you are going to say; you don't have to say anything if you don't want to." The testimony of the justice of the peace himself contradicts and denies that he warned appellant. Appellant said that he did desire to make a statement, and thereupon was questioned by the coroner's jury, after being sworn by the justice of the peace. The questions addressed to the appellant by the coroner's jury and the answers made by him were written in longhand by one of the members of the jury. Such paper was identified and shown to be then in the same condition it was after it was completed at the investigation by the coroner's jury. In substance and effect the answers of appellant to the questions propounded to him were that his wife had a "certain thing" in her mind, and said that she was going to kill herself; that he thought her remark was made in jest; that he was in the bathroom washing his hands and taking a drink of water when he saw his wife "monkeying" with a gun; that he told her to leave the gun alone; that previous to this she had told him she would kill herself, but as she did not know how to use a gun he did not believe her; that he did not take the gun away from her because he was in the bathroom; that the trouble was just a "common fight"; that her nightgown had been torn some time before the night in question; that he doesn't know what his wife was doing when he reached home; that he does not know what time

.he reached home; that he stayed in the bathroom until he "heard the shot"; that the light he believes was on the chair; that he was so frightened he does not know; that he took a 75-cent bottle of whisky home and put it on the bureau earlier in the evening, and then went up town; that he ran out of the house when he heard the shot because he saw blood on his wife and was frightened; that he changed his clothing at his father's house, because the trousers were bloody or had blood stains on them, he thinks; that he does not remember whether he laid his wife on the bed or not, and that he does not know whether he tore her clothes from her or not. A crowd had gathered around the office of the justice of the peace during this time. A deputy sheriff was placed at the front door to prevent the crowd from going in. One witness said that there was some talk of lynching appellant, but such talk did not seem to become general.

. The following morning an examination was made of the rooms, of the Ascarate apartment by the sheriff, accompanied by Mrs. Bundy. They discovered a bullet hole through a board and flooring joist in the room where the deceased was killed. They also found the imbedded bullet. The bed in that room was in the southwest corner, and there was a bathroom east of the bedroom. The direction taken by the bullet was from the bed towards the bathroom.

It was developed at the trial that appellant, for a long period of time, had maintained illicit relations with a woman named Jesus Guerrero, who bore him at least five children, four of whom were then living, their ages being eight, six and four years, and a baby of a few months of age, respectively. Appellant married this woman in August, 1914, from which the state concluded that he did so to close her mouth as a witness against him at the trial, or from a late awakened conscience, while appellant contended or rather concluded that the act was done for the purpose of legitimizing the children.

While the evidence of the state, in the first instance at least, was entirely circumstantial, the theory was that appellant and his wife were quarreling, and that the de-

ceased fired one shot at the appellant, who immediately took the pistol from her, and as she turned away from him in terror with her right arm pressed against her side, he, in sudden anger, fired the shot which put an end to her life.

The gist of the defense was that the deceased was of a morose and melancholy disposition, and especially so at the time in question on account of her pregnant condition; that she threatened to commit suicide at various times; that on the evening in question appellant and the deceased were walking on Main street when they met a girl named Ciria Osio; that the deceased took exception to the fact that her husband had greeted this girl, and pushed him, indicating anger and jealousy, whereupon appellant took his wife home. Appellant realizing that the deceased had worked herself into an angry frame of mind, left her and returned to town alone, where he visited a barber shop, took several small drinks, etc., and returned home near 12 o'clock that night. When he returned he found his wife sitting on the bed undressing herself. She faced the bathroom. Appellant placed a small whisky bottle containing whisky on a chair beside the bed, and also a pistol which he had carried from the front room. The deceased then began to upbraid him for forsaking her and spending his time with other women. Appellant denied the accusation, and "chucked her under the chin." He then started for the bathroom, when a shot rang out. He turned and saw a pistol in the hands of his wife. He commanded her to put the pistol down. She then raised it to her head, as if to kill herself, when he begged her to desist. Thereupon she lowered the pistol momentarily and he rushed upon her, for the purpose of wresting the pistol from her. A struggle for it ensued, during which the gun was discharged, which ended the life of the deceased. She fell back on the bed. Appellant tried to call her back to life, but in vain. He aroused his father's household and requested that a doctor and sheriff be sent.

State v. Ascarate, 21 N. M. 191.

## OPINION OF THE COURT.

HANNA, J. (after stating the facts as above.)—[1] The first point made by appellant is that the court erred in instructing the jury that they might find the defendant guilty of manslaughter. The theroy of appellant's contention is that the evidence did not justify the court in submitting to the jury the issue of manslaughter. The contention of the Attorney General is that no proper exception was taken to any of the instructions given by the court, and therefore the question of this assignment is not before us for determination. The exceptions taken to the court's instructions were of a very general nature. They did not point out wherein the instruction was alleged to be erroneous, and therefore cannot be considered by us, as we have held in a long line of cases. State v. Lucero, 17 N. M. 484, 486, 131 Pac. 491; State v. Alva, 18 N. M. 152, 134 Pac. 209. For a full discussion of the reasons for the rule, see Fullen v. Fullen, 153 Pac. 294, by Parker, J., decided at this term.

[2] (a) The next assignment presents two questions, both of considerable importance. The first is, that the court erred in admitting in evidence the statements made by appellant before the coroner's jury at the inquest held by them shortly after the appellant's wife was found dead, because such statements were not freely and voluntarily made. The second question is, as we understand the appellant's brief and argument, that the admission of such statements had the effect of compelling the appellant to testify against himself, in violation of section 15 of article 2 of the state Constitution, which in turn deprived the appellant of "due process of law" as guaranteed to him by the fourteenth amendment to the Constitution of the United States. The salient facts are that shortly after the lifeless body of appellant's wife was discovered, the sheriff received the appellant into his custody, without warrant, by request of the father of appellant, at the home of the latter's father. Appellant and the sheriff then repaired to the former's home, where they entered the house by way of the front door and remained in the

darkened front room during the course of about an hour, while the coroner's inquest was being held. When that investigation had been completed as to the examination of the body of the deceased, the jury, justice of the peace, sheriff, and his deputies, and appellant in custody of the sheriff, went to the office of the justice of the peace, where the coroner's jury were to proceed further with their examination as to the cause of death of the deceased. A crowd had meanwhile gathered around the office, which the sheriff prevented from entering the room by posting a deputy at the door. During the course of the jury's deliberations the justice of the peace asked the appellant if he desired to make a statement or to testify. Appellant answered in the affirmative. This is uncontradicted, and remained so throughout the trial. The justice of the peace thereupon swore appellant. Thereupon members of the jury interrogated appellant as to matters connected with the death of the appellant's wife, to which answers were made by appellant without objection and apparently freely and voluntarily and from a desire to talk and disclose all he knew. His statements did not constitute an express confession of his guilt of the commission of the crime. In fact they were quite the contrary, for they were to the general effect that his wife had taken her life by her own hand and against his wishes and entreaties. In some respects his statements were inculpatory. For instance, he said that he was in the bathroom at the time the fatal shot was fired, and, becoming frightened, rushed out the door and left the house, although he admitted that since that time he had changed his clothes because they were covered with blood. Without further explanation that fact had a tendency to incriminate appellant. The questions, or most of them, propounded to appellant, as well as the answers he made thereto, were written down by one of the jurors, and the statement was identified at the trial and shown to be in the same condition as when finished that night. When the statement was admitted in evidence the proof was uncontradicted that appellant had been asked whether he wanted to make

a statement, had replied in the affirmative, had been sworn by the justice of the peace, and had been told that anything said by him might be used against him at the trial of his case. After the state had closed its case in chief and the appellant had placed witnesses on the stand, the justice of the peace testified that he gave no warning at all to the appellant at the inquest. A careful search of the record discloses that appellant, at the trial of this case, made no statement that his testimony before the coroner's jury was made under any form of duress, nor is there any intimation on his part, or that of any witness for the appellant, that appellant's statements were involuntary. But appellant argues that the statement, when admitted, was improperly admitted, because it did not then appear that it was made without inducements or promises tending to arouse hope in the mind of the accused that by making it he would better his condition.

In the first place it is fundamental that in order for a confession to be admissible it must first be shown that in every respect it was freely and voluntarily made. 1 Wigmore on Evidence, § 815 et seq.; 1 Elliott on Evidence, §§ 271, 273; Jones on Evidence (2d ed.) § 235; Underhill, Crim. Evidence, § 160; Hughes on Evidence, § 7; Bram v. United States, 168 U. S. 533, 557, 18 Sup. Ct. 183, 42 L. Ed. 568; State v. Armijo, 18 N. M. 262, 267, 268, 135 Pac. 555.

Whether or not the contents of the alleged confession should go to the jury is in the first instance a question of law for the determination of the court. 1 Wigmore on Evidence, § 861; 1 Thompson on Trials, § 328; 1 R. C. L. § 122. The court looks to the evidence then before it, and, applying the legal principles governing confessions, determines whether the contents of the confession should be considered by the jury or not. In other words, it determines whether the requisite preliminaries concerning the admission of confessions conform with the law of the subject. If they do, it then permits evidence of the confession itself to be received. The jury, then, under proper instructions, determines what weight,

if any, shall be given to the confession. Perchance they may not believe the witnesses for the state, in which event they would disregard the confession in toto.

While a confession, in strict point of law, is an acknowledgment of guilt, still statements of an inculpatory nature are tested by the same rules as govern confessions proper, and we test the question now under discussion in that light. Bram v. United States, 168 U. S. 533, 541, 18 Sup. Ct. 183, 42 L. Ed. 568; Wilson v. United States, 162 U. S. 613, 621, 16 Sup. Ct. 895, 40 L. Ed. 1090.

A number of cases, bearing both on the question of confessions and in some instances on the question of a person being compelled to testify against himself, have been called to our attention by the appellant. We have read these cases and have made an independent investigation of practically all of the cases on the subject of confession. We find a great conflict among the cases, not on the fundamental proposition that the confession must be voluntary, for all the cases recognize that rule, but in the manner in which the courts arrive at one or the other conclusion. What is said in Tuttle v. People, 39 Colo. 243, 79 Pac. 1035, 78 L. R. A. 33, 3 Ann. Cas. 513, and the clear and definite rule laid down by that court meets with our hearty approbation. The court said:

"From these cases it appears that in some jurisdictions it is held that the statements of a party under oath before the coroner's jury are not to be regarded as voluntary, while in others the converse is held, that, where a party is under arrest at the time he testifies before a coroner's jury, his statements are not to be regarded as voluntary, unless he was fully warned; that, if the party testifying is accused of the crime under investigation, although not formally arrested, or if he is suspected of the crime at the time he testifies, and knows this fact, that in some cases it is held his testimony is voluntary, and in others not; and that the New York cases are, as before indicated, based upon the proposition that, until a party is under arrest or taken in charge for the commission of the homicide, he is to be regarded at the coroner's inquest the same as any other witness, and, unless he claims the privilege of not making statements, which may tend to incriminate him, or requests to be excused from testifying, he will be presumed to have done so voluntarily. It is impossible to reconcile the various cases to which we have referred, when considered in connection

State v. Ascarate, 21 N. M. 191.

with the facts disclosed upon which they are respectively based. Possibly the conflict is the result of a failure to contradistinguish 'voluntary' and 'involuntary' admissions, or to observe that the word 'voluntary' is not in all instances used in contradistinction to 'compulsory.' Failure to claim the privilege of not being required to make incriminating statements, or testifying without objection at inquests, seems in some cases to have been regarded sufficient from which to deduce the conclusion that testimony was voluntary, without considering whether or not extraneous influence was the inducing cause of the statements by the accused. After all, as pertinently remarked in State v. Young, 119 Mo. 495, 510, 24 S. W. 1038, and State v. Gilman, 51 Me. 206, the important question to determine in cases of this character is: Was the statement voluntary? If this question can be answered in the affirmative, then the statement is clearly admissible on a principle, the soundness of which is not disputed; but, if not voluntary, or if obtained by any degree of coercion, then it must be rejected. No hard and fast rule can be formulated which would serve as the test is every instance, but each case must be determined upon its own circumstances."

This is, substantially, the rule adopted by this court in State v. Armijo, 18 N. M. 262, 135 Pac. 555.

In one instance the accused may have been warned, and nevertheless the other facts surrounding the confession are such as would lead a reasonable thinking man to believe that the confession was not the result of the untrammeled volition of the person making it, but was induced by other influences. Again he may have been told that he need not testify when as a matter of fact he must have realized that to take advantage of the admonition would be to place himself at a great disadvantage, if not in actual danger. So it would seem that whether the confession was freely and voluntarily made must depend on all the facts and circumstances of the particular case. Precedent therefore becomes of little practical assistance in determining the question. We are satisfied that the facts and circumstances of this case disclose that the so-called confession made by the appellant was freely and voluntarily made, without duress of any sort, and that the trial court did not err in admitting it in evidence. When a conflict of evidence ensues as to certain facts connected with the preliminaries of the making of the confession, the matter becomes a question for the jury, un-

·der proper instructions. Wilson v. U. S., 162 U. S. 613, 624, 16 Sup. Ct. 895, 40 L. Ed. 1090; 1 R. C. L. § 122.

It is unnecessary to discuss the various cases cited by appellant on the question of confession, in view of the rule we have laid down here. It is sufficient to say, however, that all cases cited by appellant are either clearly distinguishable from, or are in harmony with, the principle in the case at bar.

(b) It being true that the confession was freely and voluntarily made it follows as a matter of course that the appellant was not compelled to testify against himself in violation of section 15 of article 2 of the state Constitution. An historical discussion of that constitutional principle and provision may be found in State v. Ah Chuey, 14 Nev. 79, 33 Am. Rep. 530. In that case the court said:

"The Constitution means just what a fair and reasonable interpretation of its language imports. No person shall be compelled to be a witness; that is, to testify against himself."

In Ex Parte Cohen, 104 Cal. 524, 38 Pac. 364, 26 L. R. A. 423, 43 Am. St. Rep. 127, the court said that the ·object of the provision was to grant immunity to individuals from compulsory self-accusation. Several cases are cited to us by appellant directly or indirectly bearing ·on this proposition. The typical case is where a party is brought before a grand jury, sworn, questioned, and claims the privilege, and is subsequently found guilty of contempt for refusal to answer questions upon the order of the ·court. No case is cited to us by appellant, nor are we able to find any where the facts are even reasonably similar to those of the case at bar. Here the appellant made statements before the coroner's jury of his own volition. His mind was not influenced through fear or any sort ·of coercion. All he said was perfectly voluntary on his part. Under such circumstances there was no compulsion to testify, and the very foundation for the application of the constitutional provision is lacking. Not having been deprived of this constitutional right, appellant has not been deprived of "due process of law" under the

fourteenth amendment to the Constitution of the United States.

[**3**]  Appellant complains of the action of the trial court in admitting in evidence, on the cross-examination of the accused, testimony to the general effect that appellant had known a certain unmarried woman for about nine years; that he was the father of five children born to said woman; that he had supported her and her children prior to his marriage; that he had contributed to her support and that of her children since several months after the death of his wife, and that he married her a year and several months after the death of Ana Barela Ascarate. In this regard appellant says the ostensible purpose of such evidence was to show motive, but that its real purpose was to prejudice the jury against the defendant by showing that he was a person of bad morals.   The Attorney General, who was of counsel in the case in the trial court, takes sharp issue with appellant's counsel on this declaration.   However, the question is whether such evidence was admissible.  We are of the opinion that it was admissible.   Evidence tending to show a motive for the commission of an act of homicide, if relevant, is always admissible.   It seems especially applicable to cases of circumstantial evidence.   See Underhill, Criminal Evidence, § 323; Wharton's Criminal Evidence, § 900; 4 Elliott on Evidence, § 3026; 12 Cyc. 395.   The doctrine, as stated in 21 Cyc. 915, is:

"Although the state in a prosecution for murder is under no obligation to show a motive for the commission of the crime charged, evidence tending to show the existence of a motive is admissible."

On page 916 of the same volume and work, it is said that:

"The rule is peculiarly applicable on the trial of a husband for the murder of his wife."

In 2 Bishop's N. C. Proc. § 630 (4) it is said:

"Any motive, rendering the killing probable or explaining it against inherent improbabilities, or otherwise helpful to

the jury as a circumstance, may be proved against the defendant. Yet it is not indispensable to a conviction that a motive should appear."

See, also, 1 Michie on Homicide, § 166, p. 708.

Such evidence was relevant to the subject of motive, and there was no error in admitting it. But appellant asserts that assuming such testimony was admissible as such, it was improperly admitted on cross-examination of the accused, after the state had closed its case in chief. As no argument, as such, is made on this point, and no authority whatever is cited by appellant, it becomes unnecessary for us to consider it.

[4] The last proposition argued by appellant is that the trial court erred in admitting in evidence the testimony of the little sister of deceased, which was to the general effect that on a certain night appellant assaulted his wife, beating her with a revolver. This directly contradicted the appellant, who testified on cross-examination that on that night he violently pushed open the door of a room of his home, striking his wife in the eye and nose with the door knob. Appellant now says that the admission of such testimony was erroneous because appellant cannot be legally impeached on immaterial matters. No such question, however, was presented to the trial court, and that question not being jurisdictional, it cannot be raised here for the first time. See State v. Martin McDonald, 152 Pac. 1139, just handed down.

No error appearing in the record, the judgment of the trial court is affirmed; and it is so ordered.

ROBERTS, C. J., and PARKER, J., concur.