2000 ME 55

**STATE of Maine**

v.

**Frank H. REES.**

Supreme Judicial Court of Maine.

Argued Nov. 1, 1999.
Decided March 31, 2000.

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Augusta, Michael E. Povich, District Attorney, Ellsworth, for State.

Kevin L. Barron, (orally), Bar Harbor, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

WATHEN, C.J.

[¶ 1] The State appeals[1] from an order of the Superior Court (Hancock County, *Mead, J.*) suppressing statements made by defendant. The court declined to find, beyond a reasonable doubt, that the statements were voluntary. The court's ruling was based solely on defendant's mental state and not on any improper police activity. Finding no error, we affirm.

1. The State is authorized to appeal from an order prior to trial suppressing evidence. *See* 15 M.R.S.A. § 2115-A (1980); M.R.Crim. P. 37B.

2. The Maine Constitution provides in relevant part as follows:

[¶ 2] Defendant Frank Rees was indicted for manslaughter (Class A), 17-A M.R.S.A. § 203(1)(A) (Supp.1999), and aggravated criminal OUI (Class C), 29-A M.R.S.A. § 2411(6) (1996). The indictment was brought against defendant for causing the death of William H. Porter as a result of defendant's reckless or criminally negligent operation of a motor vehicle and as a result of his operating the motor vehicle while under the influence of intoxicants. Defendant filed a motion to suppress certain statements made by him in response to police questioning on the basis that they were not voluntarily given pursuant to Article I, § 6 of the Maine Constitution.[2] A hearing was held and the court entered an order granting the motion to suppress on the following grounds:

As the record clearly indicates that the Defendant suffers from dementia, the court cannot conclude, beyond a reasonable doubt, that his statements to law enforcement officers were the product of the free exercise of his will and rational intellect. It should be stressed that this ruling makes no finding of improper or incorrect conduct upon the part of the investigating officers.

The State appeals.

[¶ 3] The court based its decision on the following test established in *State v. Caouette*, 446 A.2d 1120 (Me.1982):

[I]n order to find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will and rational intellect. While a claim of compulsion will frequently be predicated upon police elicitation or conduct, that element is not a *sine qua non* for exclusion under the exclusionary rule inherent in the guarantee against self-incrimination. While proof that a defendant's statement is spontaneous and un-

Section 6. In all criminal prosecutions, the accused ... shall not be compelled to furnish or give evidence against himself ....

Me. Const. art. I, § 6 (Supp.1999).

solicited will often result in a finding of voluntariness, such proof does not compel a finding that the defendant was free from "compulsion of whatever nature." *Id.* at 1123–24 (footnote omitted).

[¶ 4] The State contends that we should ignore *stare decisis* and overrule *State v. Caouette* in light of U.S. Supreme Court case, *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) and our case, *State v. Eastman*, 1997 ME 39, 691 A.2d 179. We decline to do so. "*Stare decisis* embodies the important social policy of continuity in the law by providing for consistency and uniformity of decisions." *Bourgeois v. Great N. Nekoosa Corp.*, 1999 ME 10, ¶ 5, 722 A.2d 369, 371. "We do not disturb a settled point of law unless 'the prevailing precedent lacks vitality and the capacity to serve the interests of justice....'" *Id.*

[¶ 5] First, *Connelly* was decided on federal constitutional grounds and *Caouette* was decided on state constitutional grounds. As we stated in *Caouette*, "federal decisions do not serve to establish the complete statement of controlling law but rather to delineate a constitutional minimum or universal mandate for the federal control of every State." *State v. Caouette*, 446 A.2d at 1122 (citing *State v. Collins*, 297 A.2d 620 (Me.1972)). We supported this position with the Supreme Court's statement in *Lego v. Twomey* that: "'Of course, the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake.'" *Id.* (quoting *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)). We noted that we had exercised this authority in *State v. Collins*, 297 A.2d 620 (1972) when we adopted a more stringent standard of proof for establishing the voluntariness of statements in order to better secure the guarantee of freedom from self-incrimination. *See id.* We further noted that the same philosophy of state-federal relationship that applied to procedural issues would also apply in determining the substantive content of the privilege against self-incrimination. *See id.* We reiterated that:

It must be remembered that the privilege exists in this case by virtue of the Maine Constitution. The Fifth Amendment is a limitation upon the federal government and has no direct reference to state action except to the extent incorporated as a requirement of due process under the Fourteenth Amendment. The maximum statement of the substantive conduct of the privilege and the requirements of voluntariness must be decided by this Court—as a matter of Maine law.

*Id.*

[¶ 6] Applying Maine law, we noted the basis of the more protective holding in *Collins* as follows:

"The constitutional privilege against self-incrimination ... reflects a high priority commitment to the principle that excluded as available to government is any person's testimonial self-condemnation of crime unless such person has acted 'voluntarily' i.e., unless he has 'waived' his constitutional privilege against self-incrimination *by choosing, freely and knowingly, to provide criminal self-condemnation by utterances from his own lips.*"

*Id.* (quoting *State v. Collins*, 297 A.2d at 626). In reaching our decision, we noted that it appeared to be "consistent with, if not required by, the classic definitions of voluntariness set forth in United States Supreme Court decisions." *Id.* at 1123.

[¶ 7] The State argues that, in light of the United States Supreme Court decision, *Colorado v. Connelly*, decided after *State v. Caouette*, the premise in *State v. Caouette* that it was consistent with federal law has changed. In this respect, the State is correct. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), explicitly holds that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'

within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167, 107 S.Ct. 515. Our statement in *Caouette* that our decision appeared to be consistent with United States Supreme Court decisions, however, was not a determinative factor. Rather, we focused primarily on an assessment of the public policy of the State of Maine.

[¶ 8] We cited *State v. Collins,* 297 A.2d 620 (Me.1972) for the proposition that the state constitution provided greater protection for this particular privilege. *See State v. Caouette,* 446 A.2d 1120, 1122 (Me.1982). In *Collins* we stated:

> In assessing public policy for the State of Maine and "the appropriate resolution of the values [we] find at stake," we go beyond the objective of deterrence of lawless conduct by police and prosecution. We concentrate, additionally, upon the primacy of the value, strongly emphasized by the three dissenters in *Lego v. Twomey,* of safeguarding "... the right of an individual, entirely apart from his guilt or innocence, not to be compelled to condemn himself by his own utterances." Since this value has been endowed with the highest priority by being embodied in a constitutional guarantee—the *constitutional privilege* against self-incrimination—we believe that it must be taken heavily into account in the formulation of the public policy of this State, notwithstanding that the majority of the Justices who participated in *Lego v. Twomey* were unwilling to derive from it a *universal* mandate for the *federal control of every State* in the Union by a standard of "proof beyond a reasonable doubt."

*State v. Collins,* 297 A.2d 620, 626 (Me. 1972) (citations omitted). We further stated as follows:

> [T]o confirm and preserve the value reflected in the constitutional privilege against self-incrimination we must minimize the risks of allowing legal effectiveness to "non-voluntary," or "involuntary," testimonial self-condemnation

even at the expense of producing a loss of evidence which might have probative value; such was the price that our society had chosen to pay when it conferred constitutional protection upon the privilege against self-incrimination.

*Id.* at 627. We find this rationale still represents Maine's public policy.

[¶ 9] Finally, contrary to the State's contention, our statements made in *State v. Eastman,* 1997 ME 39, 691 A.2d 179, are consistent with *State v. Caouette* and do not suggest a retreat from the more restrictive state standard. In *Eastman,* we followed federal precedent and declined to extend the privilege against self-incrimination to include non-testimonial evidence. Although we may look to the construction of federal constitutional provisions in U.S. Supreme Court cases and apply the same construction as far as possible, we are not confined to that construction when, as in *Caouette,* a more protective standard is warranted under Maine law.

The entry is:

Order of suppression affirmed.

SAUFLEY, J., with whom CLIFFORD, J. joins, dissenting.

[¶ 10] I respectfully dissent.

[¶ 11] In its holding today, the Court has concluded that, notwithstanding the absence of incarceration, compulsion, coercion, or police overreaching, no out-of-court statement of a defendant may be used against that defendant unless the State proves beyond a reasonable doubt that the statement was voluntary. In so holding, the court has completed its shift in focus, begun in *Caouette,* from the actions of the State to the internal motivations of the defendant. With this holding, the privilege against self-incrimination found in the Fifth Amendment, mirrored in article I, section 6 of the Maine Constitution, has been stretched beyond its historical foundations and the fundamental purpose of the Due Process Clause—to

assure governmental fair play—has been lost.

[¶ 12] The Court's analysis goes awry for several reasons. First, it blurs the distinctions between the privilege against self-incrimination, guaranteed by the Fifth Amendment to the United States Constitution and article I, section 6 of the Maine Constitution, and the protections provided in the Due Process Clause of the Fourteenth Amendment to the United States Constitution and its analog in article I, section 6–A of the Maine Constitution. Second, it fails to follow the holding of the United States Supreme Court on the very point at issue. And finally, it sets in stone a precedent which will have an effect on the prosecution of criminal cases that was never intended by the framers of the Maine or federal constitutions and is unnecessary to the protection of the fundamental rights of defendants in criminal matters.

## I. FRAMEWORK FOR ANALYSIS

[¶ 13] I would conclude that when a defendant such as Rees challenges the admission of his out-of-court statement, the following analysis applies:

1. the court must look to the privilege against self-incrimination to determine whether the statement was compelled by an external force. If so, the statement will not be admissible over an assertion of the privilege. If the court finds that statement has not been compelled,

2. the court must next look to principles of due process to determine whether the admission of the statements in light of the actions of the State would violate concepts of fundamental fairness. If principles of

due process would not result in the exclusion of the statement,

3. the court must determine whether any of the Rules of Evidence would require the exclusion of the statements. In particular, if the circumstances surrounding the making of the statement render it so inherently unreliable that it is not probative, it will not be admissible for the truth of the matters asserted therein, and

4. finally, if the court determines that the statement is inadmissible in the prosecution's case-in-chief, the basis for its exclusion will have a bearing on whether the statement is admissible at trial for any other purpose.[3]

[¶ 14] Because it is not clear whether the Court today rests its decision entirely on the defendant's privilege against self-incrimination or on a combination of privilege and due process concepts, I address the two areas of analysis separately. I will also address the Court's mistaken conclusion that its holding today is required by our decisions in *State v. Caouette*, 446 A.2d 1120 (Me.1982), and *State v. Collins*, 297 A.2d 620 (Me.1972).

## II. STARE DECISIS

[¶ 15] Preliminarily, I disagree with the Court's assertion that it is bound by principles of stare decisis to reach the conclusion it has announced today. First, I do not believe we have squarely addressed the issue presented here. Second, even if the rule in *Caouette* does apply in the present case, we have made it clear

that where the authorities supporting the prior rule have "been drastically eroded, [and] ... the suppositions on which it rested are disapproved in the

---

**3.** *See, e.g., New Jersey v. Portash*, 440 U.S. 450, 459–60, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) (holding where defendant was granted "use immunity" and compelled to testify before grand jury, defendant's statements could not be used for any reason without violating the privilege against self-incrimination); *Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct.

643, 28 L.Ed.2d 1 (1971) (holding testimony obtained in violation of Miranda may be used to impeach); *Walder v. United States*, 347 U.S. 62, 65–66, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (holding evidence obtained in violation of defendant's right to be free from unreasonable search and seizure may be used to impeach).

better-considered recent cases and in authoritative scholarly writings, and ... the holding of the [prior] case is counterproductive" to its purposes, the situation is appropriate for legal change by the Court's decision.

*Myrick v. James,* 444 A.2d 987, 998–99 (Me.1982) (quoting *Black v. Solmitz,* 409 A.2d 634, 639 (1979)).

[¶ 16] Relying on *Caouette,* which drew its holding from *Collins,* the Court concludes that the matter has been finally decided in Maine. I would conclude otherwise.

[¶ 17] The holding in *Caouette* expressly addressed itself to a distraught, physically ill, and *incarcerated* defendant. There, the Court, reviewing decisions from other jurisdictions, noted that "other jurisdictions have explicitly considered the impact of the physical and mental condition of the defendant and the circumstances usually attending incarceration, both in the presence and absence of police interrogation. Such factors have been found determinative in deciding whether a statement was the product of free will and rational intellect." *Caouette,* 446 A.2d at 1123. In stark contrast to Caouette, Rees was not incarcerated. He was neither restrained in any way by the officer, nor was he at a police station or in a police vehicle. Rees was in no way in the control or at the mercy of the officer. Statements taken from an individual who has lost his freedom, and who is in the complete control of law enforcement and the penal system, should be, and are, accorded greater protections than statements of an individual who is not incarcerated.[4] Such protections, however, do not extend to the facts of the case at hand.

[¶ 18] Moreover, *Caouette* was decided before the United States Supreme Court had an opportunity to address the admission of statements similar to the one at

bar. We did not, in *Caouette,* engage in the historical review necessary to a full resolution of this important issue, and, at least ostensibly, we purported to follow the Supreme Court's analysis. I would therefore conclude that *Caouette* is not binding precedent on the matter before the Court today.

[¶ 19] Finally, even if *Caouette* can be stretched to apply to the issue before the Court, I would not follow the holding that the Court draws from its language. It is not clear what the precise holding of *Caouette* is. To the extent that the holding of *Caouette* is that a statement that is generated through no external force (regardless of who may be the actor) may be excluded as violating the privilege against self-incrimination, it is beyond any prior declaration of law made by this Court and is not founded on any sound constitutional concept. On that basis, I would overrule *Caouette* as a decision that has lost its persuasive authority in light of a better decided Supreme Court decision, and as one that runs counter to important societal goals.

## II. CONSTITUTIONAL DOCTRINE OF CONFESSIONS

[¶ 20] The historical roots of the prohibition against the admission at trial of a defendant's confession do not necessarily comprise a linear and coherent set of rules. "[I]t has been said that so great was the perplexity resulting from an attempt to reconcile the authorities that it was manifest that ... even the legal rule to be applied was involved in obscurity and confusion." *Bram v. United States,* 168 U.S. 532, 549, 18 S.Ct. 183, 42 L.Ed. 568 (1897). These words, which Justice White (writing for the Court) dismissed as a "misconception" over a century ago, nevertheless foreshadowed the current state of the law regarding the admissibility of an out-of-

---

4. *See Miranda v. Arizona,* 384 U.S. 436, 455, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("Even without employing brutality, the 'third degree' or the specific stratagems described above,

the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.").

court statement or confession by a defendant.

[¶ 21] The recent confusion appears to stem, at least in part, from a failure to delineate the distinctions between the nature of the exclusionary rule applied in due process cases and that embodied by the privilege against self-incrimination. As will be seen, these exclusionary rules · are not identical, and accordingly, it is not proper to adopt wholesale the policies that the privilege seeks to effect into a due process analysis.

### A. Fifth Amendment Privilege Against Self–Incrimination

[¶ 22] The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. The Maine Constitution contains a similar provision: "In all criminal prosecutions, the accused ... shall not be compelled to furnish or give evidence against himself." Me. Const. art. I, § 6. In order to understand the reach of the privilege against self-incrimination, a review of the historical application of the federal and state provisions is helpful.[5]

[¶ 23] It is commonly understood that the privilege finds its roots in medieval and European Canon law. As the Supreme Court stated in *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896):

> The maxim *nemo tenetur seipsum accusare* [no one is bound to accuse himself] had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons .... While the admissions or confessions of the prisoner, when voluntarily

and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, ... made the system so odious as to give rise to a demand for its total abolition. ... So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law ....

*Id.* at 596–97, 16 S.Ct. 644.

[¶ 24] Thus, to deter the "manifestly unjust methods of interrogating accused persons" the Fifth Amendment provides those accused with a privilege to prevent forced in-court testimony and to prevent the admission of forced out-of-court statements.

[¶ 25] Early Supreme Court decisions regarding the application of the Fifth Amendment to confessions reflected this understanding of the fundamental wrong that the privilege against self-incrimination sought to prevent. The foremost pronouncement on the Fifth Amendment privilege remains *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), *overruled in part on other grounds by Kastigar v. United States*, 406 U.S. 441, 449–62, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), an early case in which the Supreme Court examined the scope of the privilege.

---

5. The historical origins of the privilege itself are somewhat controversial. One noted scholar in this area is Leonard W. Levy. His book, *Origins of the Fifth Amendment: The Right Against Self–Incrimination*, however, is not without its critics. *See generally* Leonard W. Levy, Origins of the Fifth Amendment: The Right Against Self-Incrimination (1968); The Privilege Against Self-Incrimination: Its Origins and Development (R.H. Helmholz ed., 1997). In a recent review of the work of his critics, Professor Levy concluded that "if [he] were rewriting the book [he] would make no significant changes." Leonard W. Levy, Origins of the Fifth Amendment and its Critics, 19 Cardozo L. Rev. 821, 860 (1997).

Although subsequently limited,[6] *Counselman* established that the federal privilege is applicable when there is compulsion in the form of a requirement that one testify before a grand jury. *See id.* at 562, 12 S.Ct. 195.

[¶ 26] In 1897, the Court first applied the privilege to prevent the use of a confession. *See Bram v. United States,* 168 U.S. 532, 549, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In that case, Bram was ordered to strip, was searched, and was then interrogated, all by a Halifax, Nova Scotia, detective. *See id.* at 538, 18 S.Ct. 183. During the course of the interrogation, Bram was confronted with the statement of another man who claimed that Bram had murdered a shipmate, the suggestion being that if Bram confessed it would be better for him. *See id.* at 539, 18 S.Ct. 183. The detective told Bram that he was convinced Bram was guilty, but that he also suspected Bram had an accomplice; accordingly, the detective intimated that Bram should confess and name his accomplice so as to avoid having "the blame of this horrible crime on your own shoulders." *Id.* The Court found that the statements Bram gave, in that situation, were compelled in violation of his Fifth Amendment privilege. The Court described the rule as follows:

> [It] is not that, in order to render a statement admissible, the proof must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it must be sufficient to establish that the making of the statement was voluntary; that is to say, that, from the causes which the law treats as legally sufficient to engender in the mind of the accused the hope or fear in respect to the crime charged, the accused was not involuntarily impelled to make a statement, when but for the improper influences he would have remained silent.

*Id.* at 549, 18 S.Ct. 183. The Court thus drew a distinction between the fact that a statement was made and the "particular communications" therein. What was required was that "the making of the statement was voluntary," which the Court understood involved the absence of external "improper influences." In *Bram,* these influences were that

> Bram had been brought from confinement to the office of the detective, and there, when alone with him, in a foreign land, while he was in the act of being stripped, or had been stripped, of his clothing, was interrogated by the officer, who was thus, while putting the questions and receiving answers thereto, *exercising complete authority and control over the person he was interrogating.*

*Id.* at 563, 18 S.Ct. 183 (emphasis added). What was suspect, then, was an external force that tended to compel a statement from an accused. Cases after *Bram* are consistent with this rule.

> There have been sharply differing views within the Court as to the ultimate reach of the Fifth Amendment [privilege] .... But since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion.

*Hoffa v. United States,* 385 U.S. 293, 303–04, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *see also Ziang Sung Wan v. United States,* 266 U.S. 1, 14–15, 45 S.Ct. 1, 69 L.Ed. 131 (1924); *Hardy v. United States,* 186 U.S. 224, 229, 22 S.Ct. 889, 46 L.Ed. 1137 (1902).

[¶ 27] The constitutional doctrine surrounding the privilege under the Maine Constitution followed similar reasoning. An early Maine case involving the privilege is *State v. Gilman,* 51 Me. 206 (1862). In *Gilman,* the Court, relying partly on arti-

---

**6.** *Counselman* provided for a sweeping immunity from the use of compelled testimony. *See id.* at 564–65, 12 S.Ct. 195. This holding was limited in *Brown v. Walker. See Brown,* 161 U.S. at 608, 16 S.Ct. 644.

cle I, section 6 and on the common law privilege against self-incrimination, noted:

> Great care should undoubtedly be taken to protect the rights of the accused. His secret should not be extorted from him by the exercise of any inquisitorial power. He should be fully informed of his legal rights, when called upon or admitted to testify as a witness in a matter in which his guilt is involved. No officious party should be permitted to extract confessions from him, by operating upon his hopes or his fears. But his *voluntary* statements, declarations or confessions, like his *voluntary* actions, wherever or whenever made, are legitimate and proper matters for judicial consideration, so far as they bear upon and tend to illustrate the question of guilt or innocence.

*Id.* at 225. Like the Supreme Court in *Bram,* it is clear that what is contemplated here is an external coercive force. *See Gilman,* 51 Me. at 223. Indeed, the *Gilman* Court used historical language in emphasizing that a confession may not be used against the defendant if it was "extorted from him by the use of inquisitional power."

[¶ 28] Until very recently, we have consistently followed this line of reasoning and have adhered to the analysis undertaken by the United States Supreme Court. In *Gendron v. Burnham,* 146 Me. 387, 82 A.2d 773 (1951), we reaffirmed the wisdom of reliance and coordination with established federal principles on point. There, we recognized that the privilege under the Fifth Amendment and that under article I, section 6 "are so similar in nature and identical in purpose that prece-

dent with respect to the construction of the one may well serve as precedent for the construction of the other." *Id.* at 395, 82 A.2d at 780. In *Duguay v. State,* 309 A.2d 234 (Me.1973) (per curiam), a prisoner petitioned for a writ of habeas corpus, claiming that statement had been admitted against him in violation of the privilege. *Id.* at 235. Duguay had gone to the police regarding a shooting at his apartment; there, he confessed after having been advised that whatever he said could be used against him.[7] *See id.* at 239. Duguay was subject to no "physical, mental or psychological compulsion nor was he offered any inducement to make a statement." *Id.* We found no violation of the privilege, expressly distinguishing the facts in the case from those in a number of Supreme Court cases.[8] *Id.*

[¶ 29] Thus, only with *Collins* and *Caouette* did we stray from the path laid by the Supreme Court with regard to the privilege against self-incrimination. In *Collins,* we parted ways with the majority of the Supreme Court in *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), and adopted the approach advocated by the minority in that case, *see Collins,* 297 A.2d at 625–27, adopting the requirement that the State prove beyond a reasonable doubt that a confession by a criminal defendant was voluntary. The placement of a heavier burden on the State, urged by the dissent in *Lego,* was anticipated by the majority: "Of course, the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake."

---

7. The underlying case arose before the Supreme Court's opinion in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8. We have also considered cases in which the defendant brought his or her claim under the Fifth Amendment and not under article I, section 6. See *Moffett v. City of Portland,* 400 A.2d 340, 343–44 (Me.1979); *State v. Buzynski,* 330 A.2d 422, 425 (Me.1974). In *Moffett,*

however, we required some form of external compulsion. *See Moffett,* 400 A.2d at 344 (noting source of compulsion was a threat of disciplinary action if questions were not answered). *Buzynski* centered not on the issue of compulsion but rather upon whether the result was "testimony." *See Buzynski,* 330 A.2d at 425 (holding that order to submit to a psychiatric examination did not result in compelled testimony).

*Lego,* 404 U.S. at 489, 92 S.Ct. 619. We accepted that invitation in *Collins.*

> We agree with the observation of Mr. Justice Brennan in his dissent ... [and] decide, therefore, that to confirm and preserve the value reflected in the constitutional privilege against self-incrimination we must minimize the risks of allowing legal effectiveness to 'non-voluntary', or 'involuntary', testimonial self-condemnation even at the expense of producing a loss of evidence which might have probative value; such was the price that our society had chosen to pay when it conferred constitutional protection upon the privilege against self-incrimination.

*Collins,* 297 A.2d at 627. Thus, *Collins* established that the protections guaranteed by the Fifth Amendment and article I, section 6 demanded the highest level of proof by the State. In no way, however, did *Collins* depart from the substantive underpinnings of confession law established through Supreme Court precedent.

[¶ 30] In *Caouette,* we began to move away from an established substantive understanding of the protections provided by both the state and federal constitutions. After citing a number of then-recent Supreme Court cases, we concluded:

> It must be remembered that the privilege exists in this case by virtue of the Maine Constitution. The Fifth Amendment is a limitation upon the federal government and has no direct reference to state action except to the extent incorporated as a requirement of due process under the Fourteenth Amendment. The maximum statement of the substantive content of the privilege and the requirements of voluntariness must be decided by this Court—as a matter of Maine law.

*Caouette,* 446 A.2d at 1122. I do not dispute the Court's conclusion that we are free to interpret the Maine Constitution, specifically article I, section 6, in a manner that provides greater protection than that which the United States Supreme Court finds within the Fifth Amendment privilege. We did so in *Collins* by placing a more stringent burden of proof on the State when it seeks to admit a defendant's out-of-court statements against him. Nothing, however, in the history of Maine's Constitution provides a basis for the substantive departure the Court makes today. In the absence of compulsion, coercion, or other misconduct by the State or third parties that has induced an otherwise unwilling speaker to speak against himself, article I, section 6 has historically had no effect on the use of a defendant's out-of-court statements. The rule established by the Court today reads into the Maine Constitution that which does not exist within its terms.

[¶ 31] Moreover, we have consistently interpreted fundamentally similar provisions of our constitution coextensively with their federal counterparts. When we have chosen to depart from this principle, we have " 'traditionally exercised great restraint' " in doing so.[9] *Bagley v. Raymond Sch. Dept.,* 1999 ME 60, ¶ 13, 728 A.2d 127, 132 (quoting *State v. Buzzell,* 617 A.2d 1016, 1018 n. 4 (Me.1992)). Indeed, the Court has recently reaffirmed its commitment to maintaining a coextensive application of the Fifth Amendment privilege and the privilege guaranteed by article I, section 6. *See State v. Eastman,* 1997 ME 39, ¶ 12, 691 A.2d 179, 183. No reason has been suggested for departing from such a long line of precedent today.

[¶ 32] I would therefore apply the Fifth Amendment privilege in this case just as it has been applied for decades. The question thus presented is whether the

---

9. Indeed, our departure from consistency with the jurisprudence of the Supreme Court has occurred principally in the areas of due process and the privilege against self-incrimination. That departure has been recent and not without internal inconsistencies. *See generally State v. Collins,* 297 A.2d 620 (Me. 1972); *State v. Caouette,* 446 A.2d 1120 (Me. 1982).

confession was obtained through any kind of external compulsion. In its order in the present case, the motion justice noted "that this ruling makes no finding of improper or incorrect conduct upon the investigating officers." Rees was not incarcerated. He appeared coherent and contrite. He was neither threatened physically nor abused emotionally. He was given repeated *Miranda* warnings. The only evidence relied on by the defendant in support of his motion to suppress was his diagnosis of a type of dementia.[10] In short, the court appears to have found that Rees was not subject to "improper influence," *see Bram*, 168 U.S. at 549, 18 S.Ct. 183, nor was a confession "extracted" from him, *see Gilman*, 51 Me. at 225.[11] Thus, the privilege against self-incrimination articulated in article I, section 6 of the Maine Constitution is not applicable to the determination as to whether the statements made by Rees may be admitted against him at trial.

### B. Due Process

[¶ 33] I turn then to the protections found in the due process clauses of the Maine and federal constitutions. "No State shall ... deprive any person of life, liberty, or property, without due process of law ...." U.S. Const. amend XIV. Similarly, the Maine Constitution provides: "No person shall be deprived of life, liberty or property without due process of law ...." Me. Const. art. I, § 6–A.

[¶ 34] The application of due process considerations in confession challenges did not arise until well into the twentieth century. *See Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936). Four years after we issued our opinion in *Caouette*, the Supreme Court decided *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), in which the

Court reviewed the history of its reliance on the Due Process Clause of the Fourteenth Amendment to prohibit the admission in state courts of confessions that were the product of coercive police conduct, noting that its reliance on the Fourteenth Amendment had begun at a time when the Fifth Amendment had not yet been held to apply to the states. *See id.* at 163, 107 S.Ct. 515 (citing *Brown v. Mississippi*, 297 U.S. at 286, 56 S.Ct. 461). The intermingling of the conceptual bases for the suppression of confessions did not cease, however, when the Court concluded that the Fifth Amendment did apply to the states. Rather, the Court retained its focus on the Fourteenth Amendment "even after holding, in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), that the Fifth Amendment privilege against self-incrimination applies to the States." *Connelly*, 479 U.S. at 163, 107 S.Ct. 515 (citations omitted).

[¶ 35] Between *Malloy* and *Connelly*, the Supreme Court continued to apply both the privilege against self-incrimination and due process protections to compulsion cases. It appears that the Court tended to apply the law of the privilege or of due process in conformity with the prevailing theories of factually similar cases. For example, in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court, tracking similar reasoning in *Brown v. Mississippi*, held on due process grounds that the defendant's statements, given to the police, may not be used against him when defendant "was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne." *Id.* at 401–02, 98 S.Ct. 2408; *see also Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037

---

10. That dementia led to memory *gaps*, not hallucinations.

11. It is not clear whether the finding was affirmative or merely the absence of a finding on point. If the court concluded that it did

not need to reach those issues because it found that the defendant suffered from mild dementia, the matter should be remanded for consideration of improper 'influences and coercion.

(1961) (opinion of Frankfurter, J.). Because *Mincey* was decided after the Fifth Amendment privilege against self-incrimination had been applied to the states in *Malloy,* it is not at all clear why *Mincey* could not have been decided on Fifth Amendment grounds. *Compare Mincey,* 437 U.S. at 401–02, 98 S.Ct. 2408, *with Bram v. United States,* 168 U.S. 532, 563, 18 S.Ct. 183, 42 L.Ed. 568 (1897), *and Ziang Sung Wan v. United States,* 266 U.S. 1, 14–15, 45 S.Ct. 1, 69 L.Ed. 131 (1924).

[¶ 36] It is clear now, however, that the Fourteenth Amendment has come to have two similar but separate purposes in addressing the out-of-court statements of a defendant. Preliminarily, it is the vehicle through which the Fifth Amendment has been applied to the states. Perhaps more importantly, it is the source of separate substantive rights. Conceptually, these substantive rights are similar, but not identical, to those guaranteed by the Fifth Amendment. Where the Fifth Amendment analysis seeks to determine whether the defendant's confession was compelled, a due process analysis asks "whether the State has obtained the confession in a manner that comports with due process." *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The focus here, a focus that may provide broader protections than the Fifth Amendment, is not limited to the presence or absence of compulsion, but rather addresses the totality of the State's actions in obtaining the confession. It is these separate substantive rights that I address herein.

[¶ 37] In determining whether the confession was in fact obtained in a manner that comports with our notions of due process and fair play, the focus must be on the actions of the State. Throughout the cases in which the Supreme Court has addressed the admissibility of a statement or confession using due process principles, it has maintained its "focus upon the crucial element of police overreaching." *Con-*

*nelly,* 479 U.S. at 163, 107 S.Ct. 515. Because the Due Process Clause protects each citizen *from the State's actions* depriving that person of "life, liberty, or property" without due process of law, those protections are not implicated in the absence of state conduct affecting the citizen's rights. Consequently, as the Court announced unequivocally in *Connelly,* "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of the law." *Id.* at 164, 107 S.Ct. 515.

[¶ 38] Our own decisions addressing the due process clauses of the state and federal constitutions have similarly required state action. "This Court has long adhered to the principle that the Maine Constitution and the Constitution of the United States are declarative of identical concepts of due process." *Penobscot Area Hous. Dev. Corp. v. City of Brewer,* 434 A.2d 14, 24 n. 9 (Me.1981) (citing *Pool Beach Ass'n v. City of Biddeford,* 328 A.2d 131, 135 n. 6 (Me.1974); *Michaud v. City of Bangor,* 159 Me. 491, 493, 196 A.2d 106, 108 (1963); *Jordan v. Gaines,* 136 Me. 291, 294–95, 8 A.2d 585, 587 (1939)); *see also In re Jo–Nell C.,* 493 A.2d 1053, 1056 (Me.1985); *cf. Blount v. Department of Educ. & Cultural Servs.,* 551 A.2d 1377, 1385 (Me.1988) (treating the federal and state due process provisions together).

[¶ 39] Therefore, although article I, section 6–A does not expressly require state action, we have made it clear that, just as under the Fourteenth Amendment, state action nevertheless is a necessary element of a due process claim, *see Onat v. Penobscot Bay Med. Ctr.,* 574 A.2d 872, 875 (Me.1990); *Staples v. Bangor Hydro–Elec. Co.,* 561 A.2d 499, 501 (Me.1989), regardless of the context in which it might arise, *see, e.g., State v. Cote,* 1999 ME 123, ¶ 12, 736 A.2d 262, 265 (criminal); *In re Alexander D.,* 1998 ME 207, ¶ 13, 716 A.2d 222, 226 (termination of parental rights); *Nugent v. Town of Camden,* 1998 ME 92,

¶ 18, 710 A.2d 245, 249 (municipal police power). In sum, "[d]ue process of law is another name for *governmental* fair play." *In re Stanley*, 133 Me. 91, 95, 174 A. 93, 95 (1934) (emphasis added) (construing the "law of the land" clause of article I, section 6 to be congruent with the Due Process Clause of the Fourteenth Amendment).

[¶ 40] Nonetheless, the Court today has chosen to ignore its own precedent regarding the application of the state's due process clause, *see* ME. CONST. art. I, § 6–A, as well as the analysis of the United States Supreme Court in *Connelly*. With no discussion regarding the analysis undertaken by the Supreme Court, the Court has simply asserted that it is free to provide broader protections than those provided under the federal constitution. Although that assertion, standing alone, is accurate, the Court may not create concepts in the Maine Constitution that are not actually included within its terms.

[¶ 41] Simply put, the Court is not free to interpret Maine's due process clause to protect citizens from some amorphous evil. The purpose of the clause, both under the Maine and federal constitutions, is to prevent the State from depriving an individual of rights without providing due process of law. Where there has been no conduct on the part of state actors leading to a confession, the due process clause of the Maine Constitution is simply not implicated.

[¶ 42] Moreover, the teachings of the *Connelly* decision on the federal Due Process Clause do not affect the State's ability to provide greater protections under the Maine Constitutions for its own citizens. Indeed, the Court is free to adopt, and has adopted, a more stringent burden of proof on the State for demonstrating that there has been no improper police conduct that resulted in incriminating statements. *See State v. Collins*, 297 A.2d 620, 636 (Me. 1972).

[¶ 43] In fact, in declining to follow *Connelly*, the Court appears to have misapprehended the interplay between its own analysis and the holdings of *Connelly*. The

discussion in *Connelly* did not address the weight of the burden on the State in its responsibility to disprove overreaching on the part of state actors. Rather, the *Connelly* Court addressed itself to the *reach* of the Due Process Clause. That reach does not extend to a statement that results from a force or actor that has no relationship with the State. As the *Connelly* Court noted, the flaw in such an analysis "is that it would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." *Connelly*, 479 U.S. at 165–66, 107 S.Ct. 515. Accordingly, even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible *under the Due Process Clause.*" *Id.* at 166, 107 S.Ct. 515 (emphasis added) (citing *Walter v. United States*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Coolidge v. New Hampshire*, 403 U.S. 443, 487–88, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Burdeau v. McDowell*, 256 U.S. 465, 476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921)).

[¶ 44] In sum, the judicially-crafted exclusionary rule arising from the due process clauses of our state and federal constitutions was created both to deter improper conduct by the State and to prevent the State from using its ill-gotten gains against a citizen. To apply the exclusion where there is no such conduct renders the exclusionary rule pointless.

## C. Rules of Evidence

■ A defendant who makes an inherently unreliable confession under circumstances not involving external coercion or governmental misconduct is not without recourse, however. For example, a person suffering from a mental illness that affects his connection to reality, who confesses to a crime or makes other statements incrim-

inating himself in a criminal act, may move in limine to prevent the admission of such statements. If the court determines that the statement was made under conditions that render it wholly unreliable, the statement can have no probative value and will not be admissible for the truth of the assertions contained therein. *See* M.R. Evid. 401, 601.[12]

## III. APPLICATION TO THE FACTS AT BAR

[¶ 46] I would hold, first, that on the facts found by the trial court, the Fifth Amendment privilege against self-incrimination does not apply to prevent the admission in evidence of statements made by Rees because he was neither compelled nor coerced into making those statements by any other person.[13]

[¶ 47] I would further hold that Maine's due process clause does not address the admissibility of an out-of-court statement of a suspect when no conduct of a state actor has been a causal factor in the making of that statement. Here, however, the statements at issue were, in fact, given to a police officer. The conduct of the officer, even if it was not "misconduct," may constitute an overreaching for purposes of a due process analysis, if the defendant was understood to be suffering from a physical or mental illness and the officer took advantage of that disability, however subtly, to obtain a confession.

[¶ 48] Because the motion court understood *Caouette* to require suppression of the statement *whether or not* a state actor had engaged in actions that failed to comport with our notions of due process, that is, actions that demonstrated governmental fair play, it did not address itself to the actions of the officers other than to determine that there was no "misconduct." If, given the defendant's state of mind or health, the officer's conduct, although not rising to the level of misconduct, could reasonably be understood to constitute an overreaching, then the court may invoke its judicial authority to suppress those statements pursuant to the Fourteenth Amendment. The court's inquiry must be focused on whether the interrogations techniques employed by the officer were improper even if they were improper "only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will." *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

[¶ 49] Finally, although the facts found by the court do not appear to rise to the level prohibiting admissibility under the Rules of Evidence, on remand I would instruct the court to consider whether the statement is inadmissible on purely evidentiary grounds.

[¶ 50] Accordingly, I would remand to the Superior Court to determine (1) whether, considering defendant's mental health, the State has proven beyond a reasonable doubt that the police did not overreach, and if so (2) whether the statements, because of the state of Rees's mental health, are so inherently unreliable as to be inadmissible.

---

12. *See, e.g., State v. Pinkham,* 411 A.2d 1021, 1023 (Me.1980) ("Of course, in deciding whether proffered testimony is admissible in a case of this sort, the trial justice may have to weigh considerations besides the competency of the person to be a witness. For example, the presiding justice has discretionary power to exclude testimony by a child or any other witness under [M.R. Evid. 403]."), *abrogated on other grounds by State v. Woodburn,* 559 A.2d 343, 346 n. 2 (Me.1989); *State v. Ranger,* 149 Me. 52, 55–56, 98 A.2d 652, 653–54 (1953) (discussing discretion of trial court to allow examination of child witnesses under oath).

13. *But see supra* note 9.