2012 ME 3

**STATE of Maine**

v.

**Scott E. KNOWLTON.**

Supreme Judicial Court of Maine.

Argued: Nov. 8, 2011.
Decided: Jan. 17, 2012.

John M. Pluto, Asst. Dist. Arty., Prosecutorial District No. 8, Caribou, for appellant State of Maine.

Alan F. Harding, Esq., Presque Isle (orally), for appellee Scott Knowlton.

Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta (orally), for appellant State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and LEVY, SILVER, MEAD, and GORMAN, JJ.

Dissent: ALEXANDER, J.

LEVY, J.

[¶ 1]  In this appeal we consider whether a Maine Drug Enforcement Agency (MDEA) agent initiated interrogation of a criminal defendant who had asserted his right to counsel, while in the agent's custody, in violation of the Fifth Amendment of the United States Constitution and article I, section 6 of the Maine Constitution.

[¶ 2]  The State appeals from the judgment of the Superior Court (Aroostook County, *Hunter, J.*) granting Scott E. Knowlton's motion to suppress incriminating statements made after Knowlton had invoked his right to counsel, asserting that the court improperly applied *Maryland v. Shatzer*, 559 U.S. ——, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010). In *Shatzer*, the Supreme Court established a minimum fourteen-day waiting period between the release from custody of a suspect who has invoked the right to counsel and the reinitiation of police interrogation. *Id.* at 1223. The State contends that the court should have denied the motion because Knowlton initiated further conversation about the investigation. Knowlton argues that the court properly applied the fourteen-day standard and that the MDEA agent initiated the conversation that led to Knowlton's interrogation. We vacate the judgment of the Superior Court and remand for further proceedings.

## I.  BACKGROUND

[¶ 3]  In late 2008 and into 2009, MDEA agent William Campbell investigated the importation of methamphetamine and other drugs from Canada. In the course of his investigation, Agent Campbell received information that Knowlton was involved in a drug-trafficking operation. On January 23, 2009, at about noon, Agent Campbell approached Knowlton at his place of work, told Knowlton that he needed to speak with him, and asked Knowlton to accompa-

ny him to the Caribou Police Department. Knowlton obtained permission from his employer to leave work and accompanied Agent Campbell, unrestrained, to the police station.

[¶ 4]  Upon arrival at the police station at about 12:15 p.m., Agent Campbell brought Knowlton into an interview room and told him that two other individuals had been identified in connection with illegal drug trafficking and that he had reason to believe that Knowlton was also involved. Agent Campbell read Knowlton his *Miranda* rights, which Knowlton confirmed he understood. Shortly thereafter, Knowlton became upset and asked to speak to an attorney. Agent Campbell immediately terminated the interview; placed Knowlton under arrest for aggravated trafficking of scheduled drugs, a Class A crime; and told Knowlton that he could speak with the officers if he wished to do so after he had spoken with an attorney.

[¶ 5]  A short time later, Knowlton's mother and girlfriend arrived at the police station and were allowed to speak with him. In addition, Agent Campbell contacted a bail commissioner and gave him information about Knowlton. The bail commissioner then set Knowlton's bail at $20,000 cash or $100,000 surety. At about 1:30 p.m., Agent Campbell placed Knowlton in a holding cell at the Caribou Police Department. Knowlton remained there until about 2:50 p.m., at which time Agent Campbell placed him in a car to drive to the Aroostook County Jail in Houlton.

[¶ 6]  About forty-five minutes into the hour-long drive, Knowlton asked if he could use Agent Campbell's cell phone to call his mother, which Agent Campbell permitted. The court found:

> Agent Campbell discerned from listening to [Knowlton's] end of the conversation that [Knowlton] was uncertain about what he should do and he appeared to be engaged in a discussion with his mother regarding whether he should speak with the police or not. [Knowlton] concluded his telephone call. He advised that his mother had encouraged him to speak with the police. He told the officer that he wanted to cooperate but that he was scared. Agent Campbell asked if there was anyone at the jail that he should know about in order to make sure that [Knowlton] remained safe while he was there. [Knowlton] indicated that there was not.
>
> By this time, Agent Campbell and [Knowlton] had arrived in Houlton. The officer was proceeding towards the jail and when they were just a couple of blocks away Agent Campbell raised the issue of [Knowlton's] speaking with police by stating again that if after speaking with an attorney, [Knowlton] wanted to speak with police, that he should just let them know and he would make the arrangements.
>
> [Knowlton] waited a few moments and then said, "You know, screw it. I want to talk." Agent Campbell asked if that meant that [Knowlton] was prepared to speak with him without an attorney present. [Knowlton] acknowledged that was what he meant.
>
> Agent Campbell told him not to say anything and rather than going into the jail, the two men proceeded to the MDEA offices that are located a short distance from the jail. At those offices, Agent Campbell prepared a written waiver of rights form ... in which [Knowlton] indicated that he had previously invoked his right to counsel but that after speaking with his mother he had changed his mind and was prepared to speak with the officer without an attorney. [Knowlton] signed the waiver and then participated in an interview with Agent Campbell. During that interview, [Knowlton] made incriminating

statements that are the subject of this [motion to suppress].

The time period between [Knowlton's] invoking his right to counsel and his subsequent written waiver was five hours. He was continuously in police custody. At no time during this period did [Knowlton] confer with a lawyer.

[¶ 7] On March 5, 2009, Knowlton was indicted for aggravated trafficking of scheduled drugs (Class A), 17–A M.R.S. § 1105–A(1)(G) (2010); unlawful trafficking in scheduled drugs (Class C), 17–A M.R.S. § 1103(1–A)(E) (2011); and illegal importation of scheduled drugs (Class C), 17–A M.R.S. § 1118(1), (2)(A) (2011). Knowlton moved to suppress the statements he made during his interview at the MDEA office. After a hearing, the court granted the motion in a detailed decision. The court concluded that it was Agent Campbell who had initiated an exchange about interrogation with Knowlton, finding that Knowlton "remained emotionally vulnerable"; that it was "Agent Campbell who first spoke of the issue after [Knowlton] had invoked his rights"; and that "[d]uring the first [forty-five] minutes of the ride to Houlton, [Knowlton] had not 'initiated further communication, exchange, or conversation' about speaking with the police." The court also noted that it was "difficult to know whether [Knowlton] truly had a change of heart or whether he remained subject to the inherently coercive and mounting pressures of his custodial circumstance when he signed the [*Miranda*] waiver." Applying *Shatzer*, the court concluded that the State had failed to prove that Knowlton's waiver of his right to counsel was voluntary because Agent Campbell had resumed his questioning of Knowlton just a few hours after Knowlton had invoked his right to counsel, far less than the fourteen-day standard required by the *Shatzer* decision:

[Knowlton] was at all times in custody; he had clearly invoked his right to counsel; he did not confer with counsel prior to the subsequent interrogation; two weeks had not passed and [Knowlton] did not initiate further communication, exchange[,] or conversation about interrogation.

[¶ 8] With the approval of the Attorney General, the State appeals from the court's suppression order. *See* 15 M.R.S. § 2115–A(1) (2011); M.R.App. P. 2(a)(4), 21(b).

## II. LEGAL ANALYSIS

[¶ 9] The State argues that the court erred in applying the *Shatzer* fourteen-day standard because it only applies to situations where there is a break in custody, which did not occur in this case. We review the court's suppression ruling "in two different ways: the factual findings made by the trial court for clear error, and de novo for issues of law and for the ultimate determination of whether the statement should be suppressed." *State v. Dominique*, 2008 ME 180, ¶ 10, 960 A.2d 1160 (quotation marks omitted).

[¶ 10] We proceed by considering (1) two Supreme Court decisions—*Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983)—which analyzed the circumstances under which a defendant can be deemed to have initiated interrogation after having invoked the right to counsel, and which the State contends control our decision in this case; (2) the Supreme Court's decision in *Shatzer*, which was, as previously noted, the basis for the suppression order in this case; and (3) the facts applicable to the initiation of interrogation in this case.

A. *Edwards v. Arizona* (1981) and *Oregon v. Bradshaw* (1983)

[¶ 11] In *Edwards*, the Supreme Court considered "whether the Fifth, Sixth, and

Fourteenth Amendments require suppression of a post-arrest confession, which was obtained after [the defendant] had invoked his right to consult counsel before further interrogation." 451 U.S. at 478, 101 S.Ct. 1880 (quotation marks omitted). The Court held that after a defendant invokes the right to counsel, he or she "is not subject to further interrogation by the authorities until counsel has been made available[,] . . . unless the accused . . . initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880.

[¶ 12] Applying its initiation rule to the facts, the Court determined that Edwards had not validly waived his right to counsel. *Id.* at 487, 101 S.Ct. 1880. The facts established that Edwards was arrested and informed of his *Miranda* rights. *Id.* at 478, 101 S.Ct. 1880. After talking with the police—at first denying involvement, and then seeking to "make a deal"—Edwards eventually said: "I want an attorney before making a deal." *Id.* at 479, 101 S.Ct. 1880 (quotation marks omitted). The officers immediately stopped the questioning and took Edwards to a jail cell. *Id.* The next morning, two detectives who were colleagues of Edwards's prior interrogator came to his cell and asked to speak with him. *Id.* He said that he did not want to speak with anyone, but he was told by the guard that "he had" to talk to the detectives. *Id.* The detectives then informed Edwards of his *Miranda* rights. *Id.* Edwards agreed to talk to the detectives and proceeded to make incriminating statements. *Id.* The Court deemed these statements insufficient to constitute a valid waiver because Edwards had previously invoked his right to counsel and had not "initiate[d] further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880.

[¶ 13] Thus, *Edwards* stands for the proposition that an accused who has "ex-pressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused" is the one who initiates further communication with the police. *Id.* at 484–85, 101 S.Ct. 1880. We have previously applied *Edwards* in stating that a waiver is not valid if the police reinitiated the interrogation after the defendant invoked his right to counsel. *See, e.g., State v. Harper,* 613 A.2d 945, 949 (Me.1992); *State v. Rose,* 604 A.2d 24, 26–27 (Me. 1992); *State v. Martin,* 580 A.2d 678, 681–82 (Me.1990).

[¶ 14] In *Bradshaw,* the Supreme Court provided guidance for evaluating whether a defendant, who has invoked the right to counsel, has initiated further communication. 462 U.S. at 1045–46, 103 S.Ct. 2830. There, Bradshaw requested an attorney and the police officer immediately ended the conversation. *Id.* at 1041–42, 103 S.Ct. 2830. Later that day, during a ten- to fifteen-mile drive from the police station to the jail, Bradshaw inquired, "what is going to happen to me now?" *Id.* at 1042, 103 S.Ct. 2830 (quotation marks omitted). The officer responded by telling Bradshaw that he did not have to speak with the police because he had requested an attorney. *Id.* After discussing where the officer was taking Bradshaw and the offense with which he would be charged, the officer suggested that Bradshaw might want to take a polygraph test. *Id.* Bradshaw agreed, and the next day he signed a waiver of his *Miranda* rights, took the test, and made incriminating statements. *Id.*

[¶ 15] The Court reasoned that Bradshaw's question—"what is going to happen to me now?"—"evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents

of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation." *Id.* at 1042, 1045–46, 103 S.Ct. 2830. In other words, the Court distinguished between a comment or question that "evinced a willingness and a desire for a generalized discussion about the investigation" on the one hand, and "a necessary inquiry arising out of the incidents of the custodial relationship" on the other. *Id.* at 1045–46, 103 S.Ct. 2830. The Court looked to the officer's response to Bradshaw's question in determining whether it evinced a willingness and desire for a generalized discussion about the investigation:

> That the police officer so understood it [as relating generally to the investigation] is apparent from the fact that he immediately reminded the accused that "[you] do not have to talk to me," and only after the accused told him that he "understood" did they have a generalized conversation. On these facts we believe that there was not a violation of the *Edwards* rule.

*Id.* at 1046, 103 S.Ct. 2830 (citation omitted).[1]

### B. *Maryland v. Shatzer* (2010)

[¶ 16] In *Shatzer*, a detective attempted to interview Shatzer about sexual abuse allegations while he was incarcerated for an unrelated conviction. 559 U.S. ——, 130 S.Ct. at 1217. Shatzer invoked his right to counsel, the interview ended, and he continued to serve his sentence. *Id.* Two and a half years later, more information arose regarding the sexual abuse allegations, and another detective went to interview Shatzer, who remained incarcerated. *Id.* at 1217–18. This time, Shatzer waived his *Miranda* rights, made incriminating statements, and submitted to a polygraph test. *Id.* at 1218.

[¶ 17] The precise question in *Shatzer* was how a break in custody[2] affects the *Edwards* presumption of involuntariness— that as a suspect remains in custody, there will be "mounting coercive pressure[ ]" to talk to the police. *Shatzer*, 559 U.S. ——, 130 S.Ct. at 1220–21. The Court established a minimum fourteen-day waiting period between the time the suspect is released from custody and when the police can reinitiate interrogation after the suspect initially invoked his or her right to counsel. *Id.* at 1223. The Court stated that this amount of time is enough "for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Id.*

[¶ 18] *Shatzer* specifically addressed the point at which the *Edwards* presumption of involuntariness wears off *after* a suspect has been released from custody. *Shatzer*, 559 U.S. ——, 130 S.Ct. at 1221–

---

1. The U.S. Court of Appeals for the First Circuit applied *Bradshaw* under factual circumstances similar to this case in *United States v. Fontana*, 948 F.2d 796 (1st Cir.1991). There, the defendant invoked his right to counsel, but later, while being driven to his home to deliver his car keys to his wife, inquired, "[w]hat's going to happen to me?" *Id.* at 800, 806 (quotation marks omitted). The officer responded that if the defendant wanted to talk, he would have to be read his rights and agree to waive them, which the defendant later did in the form of a written waiver. *Id.* at 806. The court stated that the defendant's question could be viewed as initiating a "generalized discussion about the investigation" because his inquiry did not "aris[e] out of the incidents of custodial relationship, such as an inquiry about the location of a restroom or telephone." *Id.* The court noted that "[i]nitiation of interrogation by the accused has been broadly interpreted." *Id.* at 805.

2. Despite the fact that Shatzer never left prison, the Court treated his placement in the general prison population equivalent to him having been released from custody. *Shatzer*, 559 U.S. ——, 130 S.Ct. at 1221–24.

22. Thus, this fourteen-day standard does not control the resolution of the present case because it is undisputed that once Knowlton invoked his right to counsel, he remained in continuous custody.

### C. The Initiation of Interrogation in this Case

■ [¶ 19] The court erred by evaluating the evidence and rendering its findings through the lens of the *Shatzer* fourteen-day standard. Because the break in custody central to the application of the four-teen-day standard is absent from this case, the court should have employed the analytical framework advanced in *Edwards* and *Bradshaw* in determining whether Knowlton voluntarily reinitiated interrogation.

[¶ 20] Based on *Edwards* and *Bradshaw*, the fulcrum upon which Knowlton's suppression motion rests is whether, as Knowlton and Agent Campbell drove toward Houlton, it was Knowlton who initiated an interrogation by telling Agent Campbell that he wanted to cooperate with the police but that he was scared. This statement can be viewed as having "initiated" a dialogue with the authorities about the investigation, similar to the *Bradshaw* defendant asking what was going to happen to him. *Bradshaw*, 462 U.S. at 1045, 103 S.Ct. 2830; *see also United States v. Fontana*, 948 F.2d 796, 806 (1st Cir.1991). However, it can also be viewed as a statement incident to Knowlton's custody because Knowlton was expressing fear at the prospect of being jailed. Although the question of whether Knowlton's statement initiated interrogation is ultimately a question of law, it can only be answered after a careful examination of all relevant facts and the reasonable inferences that can be drawn from them. If the court concludes that Knowlton did "initiate" the reopening of the interrogation, the inquiry then turns to whether Knowlton's subsequent waiver of his *Miranda* rights was knowing and intelligent. We therefore vacate the judg-ment of the Superior Court and remand the case for the court to reconsider the evidentiary record and to apply the *Edwards* and *Bradshaw* standards.

The entry is:

Judgment vacated. Remanded for further proceedings consistent with this opinion.

ALEXANDER, J., dissenting.

[¶ 21] I respectfully dissent. The principal contested issue before the trial court was the voluntariness of Knowlton's waiver of his right to counsel and his subsequent statement. As we held in *State v. Caouette*, 446 A.2d 1120 (Me.1982) and reaffirmed in *State v. Rees*, 2000 ME 55, 748 A.2d 976:

> [I]n order to find a statement voluntary, it must first be established that it is the result of defendant's exercise of his own free will and rational intellect. While a claim of compulsion will frequently be predicated upon police elicitation or conduct, that element is not a *sine qua non* for exclusion under the exclusionary rule inherent in the guarantee against self-incrimination. While proof that a defendant's statement is spontaneous and unsolicited will often result in a finding of voluntariness, such proof does not compel a finding that the defendant was free from "compulsion of whatever nature."

*Caouette*, 446 A.2d at 1123–24; *see Rees*, 2000 ME 55, ¶ 3, 748 A.2d 976.

[¶ 22] The trial court issued extensive findings in this case, with many of the key findings quoted in the Court's opinion. Based on those findings, and the trial court's analysis of the record, the trial court found that the State had failed to prove that Knowlton's waiver of right to counsel and choice to make a statement was voluntary.

[¶ 23] Key to the trial court's finding on failure to prove voluntariness was its finding that it was "difficult to know whether [Knowlton] truly had a change of heart or whether he remained subject to the inherently coercive and mounting pressures of his custodial circumstance when he signed the [*Miranda*] waiver." The trial court observed that the evidence before it could support a finding that Knowlton's written waiver of counsel was voluntary. But the trial court then observed that "[t]he evidence could also support a finding that [Knowlton] was continuously subjected to an inherently coercive environment sufficient to cast doubt upon the question of whether [Knowlton's] waiver was truly voluntary." These findings and observations fall far short of a finding the State had proven voluntariness beyond a reasonable doubt.

[¶ 24] When the defense raises a voluntariness issue regarding a statement, or, more precisely, a choice to make a statement, the State must prove voluntariness beyond a reasonable doubt. *State v. Collins*, 297 A.2d 620, 627 (Me.1972) (cited with approval in *Rees*, 2000 ME 55, ¶ 5, 748 A.2d 976). When, as here, the trial court finds that the State has failed to meet its burden of proof, the finding can be overturned on appeal only if the record compels the finding the State seeks. *See Rees*, 2000 ME 55, ¶ 3, 748 A.2d 976; *State v. Pulsifer*, 1999 ME 24, ¶ 14, 724 A.2d 1234; *Caouette*, 446 A.2d at 1123–24.

[¶ 25] The trial court's finding that it is difficult to know what motivated Knowlton to speak is supported by the record, and a contrary finding is not compelled by the record.

[¶ 26] In addition to its finding on voluntariness, the trial court also addressed the so-called fourteen-day rule to grant the motion to suppress as a matter of law. That ruling may or may not be correct as a matter of law, but we need not reach that issue on this appeal. The fourteen-day rule discussion was unnecessary in light of the finding of failure of the State's proof on voluntariness. I would affirm the trial court's judgment.